# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

JAMES ST. LOUIS,                    )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        C. A. No. 06-236-SLR
                                    )
LT. CHERYL MORRIS, et al,           )        JURY TRIAL REQUESTED
                                    )
            Defendants.             )

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT

### BACKGROUND

The original Complaint in this prisoner civil rights action was filed on April 10, 2006 against Cheryl Morris, Chris Klein and "all officers and supervisors of Delaware prisons." [D.I. 2]. The Complaint was initially dismissed as frivolous pursuant to 28 *U.S.C.* §1915. [D.I. 6]. Plaintiff James St. Louis ("Plaintiff") moved for reconsideration of the Court's decision. [D.I. 8]. The Court granted Plaintiff's Motion in part, granting Plaintiff leave to file an amended Complaint to assert a retaliation claim against the appropriate defendants. [D.I. 11].

Plaintiff's Amended Complaint was filed on October 13, 2006 against Defendants Cheryl Morris, Chris Klein, Michael Knight, Lt. Legates, Lt. Lehman, Sgt. Johnson and Sgt. Boring ("Defendants"). [D.I. 13]. Defendants' Answer was filed on March 23, 2007. [D.I. 28].

This is Defendants' Memorandum and Points of Authorities in support of their Motion for Summary Judgment.

## FACTS

During all time periods relevant to this action, Plaintiff was within the custody of the Delaware Department of Correction ("DOC") housed at Delaware Correctional Center ("DCC") in Smyrna, Delaware.

This cause of action concerns Plaintiff's employment as an inmate worker in DCC's kitchen. Plaintiff claims that certain "unconstitutional" activities were taking place in the kitchen while he was working there. Specifically, he asserts that another inmate worker, Arthur Govan, was threatening, coercing, bribing and extorting other inmates. D.I. 13 at 1. *See also* excerpts from St. Louis Transcript, attached hereto as Exhibit A, at 23-27. Plaintiff testified that Govan was in charge of assigning inmate workers to their various tasks. Exhibit A at 34. He also stated that, with Defendant Morris, Govan participated in the hiring of inmate workers. *Id.* At 36. According to Plaintiff, Govan told other workers that, if they paid him with commissary items, he would re-assign them to more desirable positions in the kitchen. *Id.* at 34. He assisted certain workers in obtaining employment by advising them in advance of the interview questions. *Id.* at 36. On various occasions, Govan threatened to kill Plaintiff if Plaintiff reported his conduct to DOC personnel. *Id.* at 32.

Plaintiff also claims that another inmate worker, the head of the sanitation department, asked other inmate workers for sexual favors in return for work promotions. *Id.* at 27.

Plaintiff asserts that he reported these various activities to Defendants, and no action was taken. He further claims that he was ultimately terminated from his employment in retaliation for his complaints.

The events leading up to Plaintiff's termination occurred in late November – early December 2005. The inmate cooks were planning a special meal for the kitchen workers as a reward for the work involved in preparing Thanksgiving dinner. *Id.* at 51. Inmates Govan and Greenwell asked Defendant Klein if they could prepare bread pudding as part of the meal. Klein agreed with the request. *Id.* According to Plaintiff, Defendant Boring mentioned to Plaintiff that it would be a good idea to have raisins with the pudding. *Id.* at 52. As Plaintiff testified, raisins are contraband in the prison. *Id.* Plaintiff testified that he told Defendant Boring to ask Defendant Klein if raisins could be brought into the facility. *Id.* at 53.

The day after this conversation, Plaintiff was called into the kitchen and accused of telling Defendant Boring that Defendant Klein had approved the raisins, when he had not done so. *Id.*

On December 7, 2005, Defendant Boring prepared an Incident Report documenting Plaintiff's statements with respect to Defendant Klein and the approval of the raisins. *See* Exhibit B attached hereto. Plaintiff was charged with Abuse of Privileges and Lying. *See* Exhibit C attached hereto. In connection with the disciplinary write-up, Plaintiff was terminated from his employment. *Id.*

The hearing on the disciplinary write-up took place on February 23, 2006. *See* Exhibit C attached hereto. Plaintiff was found guilty. He appealed the decision, and the appeal was denied. *Id.*

Plaintiff denies that he ever told Defendant Boring that Defendant Klein approved the raisins.

On December 10, 2005, Plaintiff prepared a grievance concerning his termination from the kitchen. *See* Exhibit E attached hereto. Plaintiff's grievance makes no mention of any improper conduct in the kitchen and does not suggest that Plaintiff's termination related to his reporting of improper conduct. The grievance was rejected as non-grievable as pertaining to disciplinary action.

Plaintiff's claims of retaliation against Boring are based on his assertion that she prepared a false write-up, which resulted in his termination. Exhibit A at 79. Plaintiff claims that a Lt. Bradley, who signed off on Boring's Disciplinary Report, told him that Boring admitted to Lt. Bradley that she lied on the write-up. *Id.* at 58-59. According to Plaintiff, Lt. Bradley reported that Defendant Boring told him that Defendant Morris ordered the write-up. *Id.*

Plaintiff's claims against Defendant Morris are based on his allegations that she told him on numerous occasions that if he went over her head, she would have him terminated. *Id.* at 70. Plaintiff also concluded, based on Lt. Bradley's alleged statements to him, that Defendant Morris ordered the false write-up which led to his termination. *Id.* at 71.

With respect to the remaining Defendants, Klein, Knight, Legates, Lehman and Johnson, Plaintiff pointed only to their inactivity in response to his complaints about improper conduct in the kitchen. *Id.* at 71-79. He identified no acts of retaliation against him by these Defendants.

For example, when asked if Defendant Klein had any role in his termination from employment, Plaintiff responded: "I have no idea. I know that everything that supposedly goes through those offices are supposed to go through him." *Id.* at 72.

When posed the same question with respect to Defendant Knight, Plaintiff once again testified: "I have no idea at all." *Id.* at 74. He continued, "I'm assuming anything that goes to the main office, where Chris Klein was and Mr. Knight is, that Mr. Knight sees it." *Id.*

Plaintiff stated that he couldn't state "exactly for sure yes or no" as to whether Defendant Legates had a role in his termination. *Id.* at 75. With respect to Defendant Johnson, Plaintiff testified that he didn't believe that Defendant Johnson was involved in his termination: "I don't believe so, but I'm not positive." *Id.* at 79.

Finally, when asked about Defendant Lehman, Plaintiff stated that he believed Defendant Lehman would have had a vote as to his termination from employment. "Whether he voted for my termination or whether he voted against it, I couldn't tell you. But I believe he would have had – yes, he had a part of it somehow." *Id.* at 77.

## ARGUMENT

### I.    STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) provides that a party is entitled to summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A fact is material if its resolution will affect the outcome under the applicable law, and an issue about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). When considering a Motion for Summary Judgment, the court must view the evidence in the light most favorable to the nonmoving party. *O'Donnell v. United States,*

891 F.2d 1079, 1082 (3d Cir. 1989).  A party seeking summary judgment always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of  "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any..." which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 323-25 (1986).  Once the movant satisfies this burden, the non-moving party must demonstrate to the court that sufficient evidence exists from which a jury might return a verdict in its favor.  *Id.*  The mere existence of some evidence in support of the non-moving party will not be sufficient to support a denial of a motion for summary judgment; there must be enough evidence to enable a jury to reasonably find for the non-moving party on that issue.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249.

For the reasons stated herein, Defendants are entitled to judgment as a matter of law because Plaintiff cannot present evidence which demonstrates any disputed genuine issue as to any material fact.

## II.    DEFENDANTS ARE ENTITLED TO JUDGMENT ON PLAINTIFF'S RETALIATION CLAIM.

Plaintiff alleges that he was terminated from his employment in the kitchen at DCC in retaliation for reporting improper conduct by other inmates.  Government actions, which standing alone, do not violate the Constitution, may nevertheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right.  *Allah v. Seiverling,* 229 F.3d 220, 224 (3d Cir. 2000).

The required elements of a prisoner claim for retaliation are set forth in *Rauser v. Horn*, 241 F.3d 330 (3d Cir. 2001).  First, a prisoner alleging violation of his Constitutional rights due to retaliation against him must show that "the conduct which led

to the alleged retaliation was constitutionally protected." *Id.* at 333.

Next, the prisoner must show that "he suffered some 'adverse action' at the hands of the prison officials." *Id.* The prisoner meets this requirement by showing that the action in question "was sufficient to deter a person of ordinary firmness from exercising his [constitutional] rights." *Allah*, 229 F.3d at 225.

The final prong of the *Rauser* test requires a prisoner to establish a causal link between the exercise of the constitutional right and the adverse action. *Rauser,* 241 F.3d at 333. This causal connection element requires a burden shifting analysis. The prisoner bears the initial burden of proving that his protected conduct was a "substantial or motivating" factor in the defendant's decision to take adverse action. *Id.* If the prisoner establishes this connection, the burden then shifts to the defendant to prove, by a preponderance of the evidence, that he would have taken the same action, absent the protected conduct. *Id.*

In determining whether there is a causal connection, the court should afford deference to the decisions of prison officials, due to the difficulties posed in administering a prison. *Id.* at 34. Thus, actions which impinge on the constitutional rights of an inmate are nevertheless valid if they are "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987).

In this case, an inmate complained about the conduct of other inmates, an event which most likely occurs frequently in a prison. If this type of complaint is elevated to the level of "constitutionally protected conduct," prison officials would be hampered in their operation of the facility. They would have to be concerned that taking any type of action with respect to an inmate who has lodged such complaints would result in a

retaliation claim.  Thus, Plaintiff's complaints about activities in the prison kitchen should not be afforded constitutional protection.

With respect to the second requirement under *Rauser*, any allegation that Plaintiff suffered "adverse action" is premised on the assumption that Plaintiff had a right to employment.  As this Court noted in the initial decision dismissing the original Complaint, "[t]raditionally, prisoners have had no entitlement to a specific job, or even to any job." *James v. Quinlan,* 866 F.2d 627, 630 (3d Cir. 1989).  *See* D.I. 6.

In *Fox v. Taylor,* 2005 WL 2365276, at *2 (D. Del. Sept. 27, 2005) (attached hereto as Exhibit E), the inmate claimed that defendants discriminated against and harassed her, and that when she complained, defendants retaliated against her by having her suspended and then terminated from her prison employment.  In dismissing the complaint, the court stated that plaintiff's retaliation claim was based on her alleged right to hold a job, a right she did not have.  *Id.*  The court continued by finding that, even if plaintiff had a right to her job, she had not shown that the retaliation she perceived did not advance legitimate penological goals.  *Id.*

In this case, Plaintiff had no constitutional right to employment in the kitchen.  Even if had such a right, he has not shown that his conduct in complaining about other inmates was a substantial or motivating factor in the decision to terminate him.  He was discharged because he charged with and found guilty of two disciplinary infractions related to his prison employment.  He was found guilty of lying in connection with a potential attempt to bring contraband in to the prison and of abusing the privileges he acquired by virtue of his job in the kitchen.  Thus, his termination was "reasonably related to legitimate penological interests."

Because Plaintiff cannot satisfy the requirements under *Rauser,* Defendants are entitled to judgment on Plaintiff's retaliation claim.

## III.    DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

The doctrine of qualified immunity protects government officials from civil liability insofar as their conduct "does not violate clearly established statutory or Constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

The first question in a qualified immunity analysis is whether the facts show that the defendant's conduct violated a constitutional right. *Id*. The court must then determine whether the constitutional right allegedly violated was clearly established at the time that the conduct occurred. *Id*. In determining whether a right was clearly established, the dispositive inquiry is whether it would be clear to a reasonable person in the official's position that his conduct was unlawful. The "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The court must ask whether a reasonable public official would know his or her specific conduct violated clearly established rights. *Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir. 1996).

In this case, it is not clearly established that an inmate's complaints about other inmates is constitutionally protected conduct within the context of a retaliation claim. Further, it is not clearly established that terminating an inmate for lying regarding contraband and abusing privileges conferred by virtue of his employment would not advance legitimate penological goals. In short, there is no case law that would have put Defendants on notice that their conduct, in the circumstances of this case, violated

Plaintiff's rights.

Thus, Defendants are entitled to qualified immunity.

## IV.    DEFENDANTS HAD NO INVOLVEMENT IN THE ALLEGED CONSTITUTIONAL VIOLATION.

The Third Circuit has held that a "defendant in a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988). *See also Monell v. Dep't of Social Servs.*, 436 U.S. 658 (1978). Personal involvement can be shown through assertions of personal direction, or actual knowledge and acquiescence. *Rode*, 845 F.2d at 1207.

In this case, Plaintiff alleges that he was subjected to retaliation when he was terminated from his employment in the prison kitchen. However, there is no evidence that any of the Defendants were involved in Plaintiff's termination.

With respect to Defendant Morris and Defendant Boring, Plaintiff is relying on what Lt. Bradley allegedly told him (that Defendant Morris order Defendant Boring to fabricate the disciplinary charge). By virtue of their Answer to the Complaint, the Defendants have denied Plaintiff's allegations, and there is no indication in the record that Lt. Bradley will verify Plaintiff's claims.

With respect to the remaining Defendants, Knight, Klein, Legates, Lehman and Johnson, as set forth herein at 4 - 5, Plaintiff has admitted that he does not even know whether they were involved in his termination.

On these facts, in the absence of any evidence of personal involvement, Defendants are entitled to judgment.

**V.    UNDER THE ELEVENTH AMENDMENT, DEFENDANTS CANNOT BE HELD LIABLE IN THEIR OFFICIAL CAPACITIES.**

"[I]n the absence of consent, a suit [in federal court] in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). This preclusion extends to state officials when "the state is the real, substantial party in interest." *Id.* at 101 (*quoting Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945)). "Relief sought nominally against an [official] is in fact against the sovereign if the decree would operate against the latter." *Id.* (*quoting Hawaii v. Gordon*, 373 U.S. 57, 58 (1963)). A State may waive its Eleventh Amendment immunity. However, such waiver must constitute an "unequivocal indication that the State intends to consent to federal jurisdiction that otherwise would be barred by the Eleventh Amendment." *Ospina v. Dep't of Corrections*, 749 F. Supp. 572, 578 (D. Del. 1990) (*quoting Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 238 n.1 (1985)).

In this case, the State of Delaware has neither consented to Plaintiff's suit nor waived its immunity. Therefore, under the Eleventh Amendment, Defendants cannot be held liable in their official capacities.

WHEREFORE, for the reasons set forth herein, Defendants respectfully request that this Court grant summary judgment in their favor.

STATE OF DELAWARE
DEPARTMENT OF JUSTICE


/s/ Eileen Kelly
Eileen Kelly (#2884)
Deputy Attorney General
820 N. French Street, 6th Floor
Wilmington, DE 19801
eileen.kelly@state.de.us
(302) 577-8400
Attorney for Defendants

DATE: October 12, 2007

## CERTIFICATE OF SERVICE

I hereby certify that on October 12, 2007, I electronically filed *Defendants'*

*Memorandum of Points And Authorities In Support of Their Motion for Summary*

*Judgment* with the Clerk of Court using CM/ECF.  I hereby certify that on October 12,

2007, I have mailed by United States Postal Service, the document to the following non-

registered party:  James St. Louis.


/s/ Eileen Kelly
Deputy Attorney General
Department of Justice
820 N. French St., 6th Floor
Wilmington, DE 19801
(302) 577-8400
eileen.kelly@state.de.us

# EXHIBIT A

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JAMES ST. LOUIS,                    )
                                    )
        Plaintiff,                  )
                                    )    Civil Action No.
v.                                  )    06-236-SLR
                                    )
LT. CHERYL MORRIS, et al,           )
                                    )
        Defendants.                 )

        Deposition of JAMES ST. LOUIS taken pursuant to
notice at the Delaware Correctional Center, 1181 Paddock
Road, Smyrna, Delaware, beginning at 10:00 a.m. on
Wednesday, August 10, 2007, before Robert Wayne Wilcox,
Jr., Registered Professional Reporter and Notary Public.

APPEARANCES:

        JAMES ST. LOUIS (pro se)
        SBI# 446518
          Delaware Correctional Center
          1181 Paddock Road
          Smyrna, Delaware  19977
          for himself,

        EILEEN KELLY, ESQ.
        STATE OF DELAWARE DEPARTMENT OF JUSTICE
          820 North French Street - 6th Floor
          Wilmington, Delaware  19801
          for the Defendants.

CORBETT & WILCOX
230 North Market Street - Wilmington, Delaware 19801
(302) 571-0510

Corbett & Wilcox is not affiliated
with Wilcox & Fetzer, Court Reporters

James St. Louis

2 (Pages 2 to 5)

Page 2

1           JAMES ST. LOUIS,
2       the witness herein, having first been
3       duly affirmed on oath, was examined and
4       testified as follows:
5  BY MS. KELLY:
6       Q.  Okay.  Mr. St. Louis, was there anything you
7  wanted to put on the record before we get started?
8       A.  Yes.
9       Q.  Okay.  Go ahead.
10      A.  First, I want to let it be known that I did
11  ask for a legal advisor to call me and advise me during
12  this deposition, and apparently, it's not going to
13  happen.  I want it to be known that I'm not being
14  represented by an attorney whatsoever, and I object to
15  the unfair system that is putting a seasoned, skilled
16  trial lawyer against an individual who is unskilled and
17  lacks the evidentiary knowledge of the rules of the
18  judicial system that could bring forth improper evidence
19  without giving me proper representation.
20      Q.  Mr. St. Louis, I would like to put on the
21  record that I move for lead to depose you with the court,
22  and Judge Robinson granted that motion, knowing that you
23  were unrepresented.  You filed the motion, at least one,
24  for representation, which has been denied.  And as I told

Page 3

1  you, I feel that, under Judge Robinson's ruling, I do not
2  have the authority to provide you with legal counsel --
3  that's already been decided -- or with legal assistance
4  at the deposition.
5           All right.  You're here today for your
6  deposition in the case St. Louis versus Morris, and I
7  represent the defendants, who are Morris, Klein, Knight,
8  Legates, Lehman, Johnson and Boring.
9           Have you ever been deposed before,
10  Mr. St. Louis?
11      A.  No, ma'am.
12      Q.  Okay.  Let me just go over a few basic things.
13           First of all, we can only speak one at a
14  time, because the court reporter can only take down one
15  person at a time speaking.  So I would ask that you wait
16  until I finish my question, and I'll wait till you finish
17  answering before I start to talk again.
18           Second, all responses must be out loud.
19  He can't take down a nod or a shake of the head or
20  uh-huh.  So you need to articulate what it is that you
21  want to say.
22           If I ask you a question and you go ahead
23  and answer it, I'm going to assume that you understood
24  what I was asking you.  So if at any time my questions

Page 4

1  are unclear or you don't understand what I'm asking you,
2  please let me know, and I will try to rephrase or clarify
3  what I've asked you.
4           All right.  Do you understand what I've
5  just explained?
6       A.  Yes, ma'am.
7       Q.  Okay.  Are you known by any other names other
8  than James St. Louis?
9       A.  My legal name is Lloyd James St. Louis, Jr.
10      Q.  Are you currently on any medication?
11      A.  No, ma'am.
12      Q.  Is there any reason today that you would not
13  be able to testify truthfully to the best of your
14  ability?
15      A.  No reason whatsoever.
16      Q.  Now, have you ever been a party to prior civil
17  lawsuits other than this one?
18      A.  Party to -- I've put in a 1983 before, if
19  that's what your question is.
20      Q.  Right.
21           Have you ever filed any other lawsuits
22  other than the one that we're here about today?
23      A.  Civil lawsuit.  Yes, I did.
24      Q.  Okay.  Do you recall the names of any of those

Page 5

1  cases or what courts they were in?
2       A.  They were in --
3       Q.  Do you remember any of them?
4       A.  -- Judge Sue Robinson's court.
5       Q.  Okay.  Do you know the names of any of the
6  cases?
7       A.  I couldn't tell you that right off the top of
8  my head.
9       Q.  Okay.  Do you remember how many there were?
10      A.  To my knowledge -- okay.  I'm going to object
11  to that question, because I don't think it has any
12  reference or anything to do with this case at all.
13      Q.  Your objection is on the record, but you still
14  need to answer the question.
15      A.  Okay.  Civil suits that have been filed --
16  there is one that was -- there was one that was filed
17  against Melanie Withers.  I believe her name was on it.
18  And the judge overruled it because she said that Heck v.
19  Humphrey -- and I had to have my case overturned.  There
20  is several -- two civil suits pending right now in the
21  Third Circuit.
22      Q.  Anything else?
23      A.  That's it.
24      Q.  Okay.  What's your date of birth?

James St. Louis

Page 6

1    A.  6/13/51.
2    Q.  Where were you born?
3    A.  Carthage, New York.
4    Q.  Prior to your incarceration where were you
5    living?
6    A.  Laurel, Delaware.
7    Q.  How long did you live there?
8    A.  Almost six years.  Maybe seven years.
9    Q.  What's your highest level of education?
10   A.  Second year of college.
11   Q.  What college was that?
12   A.  University of Dubuque, Iowa.
13   Q.  So you lived in Iowa, in Delaware.
14        Any other states?
15   A.  I grew up and lived in New York and went to
16   college in Iowa.
17   Q.  Okay.  Any other states that you've lived in?
18   A.  No.
19   Q.  Are you currently married?
20   A.  No.
21   Q.  What was your last employment prior to your
22   incarceration?
23   A.  New Rivers Construction Company.
24   Q.  What were you doing for them?

Page 7

1    A.  I was one of four maintenance.  I was
2    classified as maintenance, but we were doing construction
3    work upgrading power plants in the State of Delaware.
4    Q.  How long did you have that job?
5    A.  Not quite a year, I guess.
6    Q.  Since you left college, what other kinds of
7    jobs have you had?
8    A.  Since I left college?
9    Q.  Mm-hmm.
10   A.  I sold furniture, I think, for about 12 years,
11   and then I worked for my father, who owned a monument
12   company, for close to 14 years.
13   Q.  Anything else?
14   A.  I was self-employed.  I ran a donut shop and
15   an arcade.
16   Q.  Now, this case concerns or addresses
17   employment that you had in the prison kitchen.  Is that
18   right?
19   A.  Yes, ma'am.
20   Q.  When did you start working in the kitchen?
21   A.  I believe it was in 2001, I think.  It was
22   either 2001 or 2002.
23   Q.  When you started working in the kitchen, what
24   was your job title, if you had one?

Page 8

1    A.  I started in the tray room, t-r-a-y room.
2    Q.  What's that?
3    A.  What did you say?
4    Q.  Oh, I'm sorry.
5        What's the tray room?
6    A.  Tray room is where the inmates, after they're
7    done their meals -- they return the trays and we run them
8    through the cleaning machines.
9    Q.  How long did you do that?
10   A.  I don't know.  Five, maybe six months.
11   Q.  Then after that you continued to work in the
12   kitchen?
13   A.  Yes.
14   Q.  What did you do next?
15   A.  I went to sanitation department.
16   Q.  What did that involve?
17   A.  Cleaning and trying to keep everything to
18   code.
19   Q.  Cold?
20   A.  Code, c-o-d-e.
21   Q.  Oh, code.
22        C-o-d-e?
23   A.  (The witness indicated.)
24   Q.  Okay.  Sorry.

Page 9

1        About how long did you do that?
2    A.  Not quite a year, I guess.
3    Q.  What did you do next in the kitchen?
4    A.  I went to be a line server, serving food to
5    the inmates.  And I only did that for a couple months.  I
6    was promoted to third cook.
7    Q.  Do you remember when you became third cook?
8    A.  I'd have to look it up exactly.
9    Q.  Okay.
10   A.  It's in my discovery papers, though.
11   Q.  Okay.  What does a third cook do?
12   A.  Third cook prepares the meals.
13   Q.  At some point were you promoted from third
14   cook to something else?
15   A.  Second cook.  Yes.
16   Q.  Do you remember about when that happened?
17   A.  I'm not sure the exact date.  Again, it's in
18   the discovery package.
19   Q.  When did your employment in the kitchen end?
20   A.  November 9th, 2005.
21   Q.  Since you stopped working in the kitchen, have
22   you had any other employment here?
23   A.  No, ma'am.
24   Q.  Why is that?

James St. Louis

4 (Pages 10 to 13)

|  | Page 10 |  | Page 12 |
|---|---|---|---|
| 1 | A. I was told I was blacklisted. | 1 | Q. So in addition to the criminal Supreme Court |
| 2 | Q. Who told you that? | 2 | case -- |
| 3 | A. One of the C/Os who told me not to reveal his | 3 | A. Mm-hmm. |
| 4 | name. | 4 | Q. -- you feel that you're not allowed to work |
| 5 | Q. Okay. Do you know, blacklisted by whom? | 5 | because of -- |
| 6 | A. He told me it was Ms. Morris. | 6 | A. This civil case, yes. |
| 7 | Q. Okay. That would be the individual that's the | 7 | Q. Okay. What makes you think that? |
| 8 | defendant in this lawsuit? | 8 | A. What makes me think that? I've already |
| 9 | A. Yes, ma'am. | 9 | discussed it. I've talked about it already with |
| 10 | Now, I've also been told, because of my | 10 | Mr. Milbourn, and I've talked about it with Ms. Atallian |
| 11 | court case that I have in the United States Supreme | 11 | when I was over in the MHU when they came over and gave |
| 12 | Court, that the institution does not want me to work, go | 12 | me an emergency classification and moved me out of the |
| 13 | to any education or do any programs until my court case | 13 | MHU because they realized it was illegal putting me |
| 14 | is settled. | 14 | there. |
| 15 | Q. What court case are you talking about? | 15 | Q. So you talked to Counselor Milbourn and |
| 16 | A. The United States Supreme Court case on my | 16 | Atallian? |
| 17 | postconviction relief. | 17 | A. Yes, ma'am. |
| 18 | Q. Okay. So that would be a criminal matter? | 18 | Q. And -- |
| 19 | A. Yes, ma'am. | 19 | A. They moved me in November of 2006 out of the |
| 20 | Q. And you've been told that -- | 20 | MHU to the building I'm in right now. |
| 21 | A. By the counselor -- | 21 | Q. And what's that? |
| 22 | Q. Okay. | 22 | A. Delta East. |
| 23 | A. -- of the building I'm in told me that. | 23 | Q. When were you moved to MHU? |
| 24 | Q. Who is your counselor? | 24 | A. It was near the end of July. |

|  | Page 11 |  | Page 13 |
|---|---|---|---|
| 1 | A. I think her name is Thompson. | 1 | Q. Of 2006? |
| 2 | Q. Did she give you any idea why that would be | 2 | A. 2006. No. I spent 138 days in the MHU. |
| 3 | the case? | 3 | Q. Okay. |
| 4 | A. She called Mr. Milbourn, who was the head | 4 | A. I couldn't tell you the exact day. I would |
| 5 | counselor, had a meeting with him and Mr. McMahon, and | 5 | have to look it up. |
| 6 | called me back into the office. And they made a | 6 | Q. Okay. All right. Do you know why you were |
| 7 | decision. They just told me that's what has to be done | 7 | moved to MHU? |
| 8 | and that's what's being done. They didn't give me a | 8 | A. Because of this action from the kitchen. |
| 9 | reason why. | 9 | Q. From the discipline? |
| 10 | Q. So you were told that you couldn't work or do | 10 | A. Yes. |
| 11 | programming? | 11 | Q. And then at some point you were reclassified |
| 12 | A. No. Correct. | 12 | to Delta East? |
| 13 | Q. So you've asked to work; is that right? | 13 | A. Yes. Last November. |
| 14 | A. Yes, ma'am. | 14 | Q. Okay. But Counselors Atallian and Milbourn |
| 15 | Q. Would you put that request to the counselor? | 15 | told you that you couldn't work because of this lawsuit? |
| 16 | A. Yes, ma'am. I met with the counselor and | 16 | A. Yes. |
| 17 | talked to her. What has happened there is, with the case | 17 | Q. Did they explain that any further? |
| 18 | that I have in the United States Supreme Court and this | 18 | A. Because -- no. Well, they -- what they |
| 19 | civil case right here, they have classified me to a | 19 | were -- they had talked to the institution itself, the |
| 20 | higher grade of security. And because of this case here | 20 | prison system itself, and said that it would be to my |
| 21 | pending, they don't know where to put me on the compound. | 21 | benefit and to the prison's benefit to get this issue |
| 22 | And they don't want me involved in any other work because | 22 | resolved first before moving on. |
| 23 | I have brought forth constitutional issues that were | 23 | Q. Do you know who Atallian and/or Milbourn had |
| 24 | being violated in the kitchen. | 24 | spoken with? |

## Page 14

1    A.   Who they spoke with?  I know that Mr. McMahon
2   was part of it.  He was the counselor that sent me to
3   MHU.  Outside of that I'm not sure who they talked to,
4   because I was called down to her office.  She made a
5   phone call and told me that I had to go back to my cell.
6   She had to have a private conversation with a couple
7   individuals.  And ten minutes later she called me back
8   down to let me know what their decision was.
9    Q.   You were told that verbally?
10   A.   Yes, ma'am.
11   Q.   She didn't --
12   A.   I was -- she told me verbally that they do not
13   program.  They do not want me to do any
14   education or any employment at all.
15   Q.   Did you ever get anything in writing about
16  that?
17   A.   No.  She wouldn't give it to me.  I asked.
18   Q.   Okay.
19   A.   As a matter of fact, she won't even respond to
20  anything that I've asked for.  You asked for disclosure
21  on records or anything that I might use for evidence, and
22  they are totally ignoring my pleas for my records.  They
23  won't give them to me at all.
24   Q.   This is your classification records?

## Page 15

1    A.   That's my classification records, the reasons
2   why I was classified where I was, what my disciplinary
3   actions are in this prison since I've been here -- six
4   years.  I've asked for the medical records.  They have
5   refused to give them to me.  And I've also asked
6   Lieutenant DeJesus about the report on Sergeant Johnson's
7   solicitation of inmates to change my mind and drop this
8   lawsuit.  And he has refused to give it to me.  They --
9   as a matter of fact, I was told by Mr. Martin of the law
10  library yesterday in an appointment that most likely you
11  would have all that information today with you.
12   Q.   Have you written to these people that you --
13   A.   Yes, ma'am.  I have sent copies to the court
14  and to the Department of Justice both.
15   Q.   Okay.  You need to wait until I finish the
16  question.
17   A.   Sorry.
18   Q.   All right.  Now, you've been here for six
19  years, you just said?
20   A.   Six years and three months, I believe.
21   Q.   Okay.  And this is your only incarceration?
22   A.   Yes, ma'am.
23   Q.   I want to caution you that you do not discuss
24  with me any pending criminal matters that you might have

## Page 16

1   in substance.  I know that you mentioned that you have
2   one in the Supreme Court, but don't tell me anything
3   about it.  Okay?
4    A.   Mm-hmm.
5    Q.   I want you to just tell me what your criminal
6   convictions are.  Just the title.  You know, like robbery
7   first or whatever it is.  Not in any detail.  But tell me
8   what your criminal convictions are.
9    A.   One criminal conviction, rape.
10   Q.   Mm-hmm.
11       Is that it?
12   A.   Continuous sexual abuse, I believe.  And
13  that's it.
14   Q.   Okay.  Have you been in any institution other
15  than Delaware Correctional Center?
16   A.   No, ma'am.
17   Q.   So you've been here the whole time?
18   A.   Yes, ma'am.  Well, no.  I was -- first I was
19  in -- I was down in Georgetown.
20   Q.   At SCI?
21   A.   Okay.  Yes.  And I went to trial down in
22  Georgetown.  They -- after jury trial they put me back in
23  pretrial, and from pretrial I came to here.
24   Q.   Okay.

## Page 17

1    A.   Now, I'm going to make a request too, while
2   we're in the middle of this before I forget, that I want
3   to review everything.  It says under 30 (e) that I have a
4   right to review this.
5    Q.   The transcript, you're saying?
6    A.   The transcript, yes.
7    Q.   Okay.  That's correct.  And I was going to
8   mention this at the end.  But you have the right to
9   review the transcript and make any changes --
10   A.   Mm-hmm.
11   Q.   -- or corrections.
12       It's my understanding that you do want
13  to do that.
14   A.   Yes, ma'am.
15   Q.   That will be arranged for after the
16  deposition.  It's got to be transcribed, and that takes a
17  little bit of time.  Not too long.
18       Now, in terms of procedural history of
19  this case, my understanding is that you originally filed
20  a complaint in April 2006.  Is that --
21   A.   Somewhere around there, yes.
22   Q.   After you filed the complaint what happened?
23   A.   I don't understand what you're looking for.
24   Q.   Well, what did the Court do in response to you

James St. Louis

6 (Pages 18 to 21)

| Page 18 | Page 20 |
|---|---|

**Page 18**

1  filing the complaint?
2      A.  Let me look.  I can tell you.  Initial
3  complaint was filled out April 6th, 2006.  April 20th in
4  forma pauperis was granted.
5      Q.  Maybe --
6      A.  June 14th, 2006 the complaint was dismissed
7  without prejudice.
8      Q.  Okay.  That's what I wanted.  That's what I
9  was trying to ask about.  And once your complaint was
10  dismissed without prejudice, what did you do in response
11  to that?
12      A.  Okay.  The judge had said when it was
13  dismissed that I could file an amended complaint, which I
14  did.  I filed an amended complaint for retaliation claim,
15  which the judge said in her motion to dismiss, I guess,
16  she would accept it as a retaliation claim.  So I adhered
17  to her notes and I filed a retaliation claim.
18      Q.  Let me just see if we're talking about the
19  same thing.
20          MS. KELLY:  I want to mark this as
21  St. Louis 1.
22          (St. Louis Deposition Exhibit No. 1 was
23  marked for identification.)
24

**Page 19**

1  BY MS. KELLY:
2      Q.  Okay.  I'm going to show you what has been
3  marked as St. Louis 1.  Could you look it over and tell
4  me if you recognize what it is?
5      A.  Same thing I have in my hand.
6      Q.  Okay.
7      A.  Motion to leave.  Yes.
8      Q.  Okay.  So is that your amended complaint?
9      A.  Yes.  The judge wouldn't accept it -- the
10  first one the way it was.  She said I would have to amend
11  it, and then she would accept it as a retaliation claim,
12  which is the reason I amended it.
13      Q.  Okay.  Does the amended complaint that has
14  been marked as Exhibit 1 set forth your allegations in
15  the case?
16      A.  It adds to the allegations from the initial
17  complaint.  It's not the only complaints there are.
18      Q.  All right.  But the Court told you to file an
19  amended complaint?
20      A.  Exactly.
21      Q.  Is that it?
22      A.  That's the amended complaint.
23      Q.  All right.  So are you saying you don't have
24  all the allegations in here?

**Page 20**

1      A.  I'd have to read it to make sure again.
2      Q.  Okay.  Do you mind glancing at it?
3      A.  Sure.
4      Q.  Certainly take your time.
5      A.  What the amended complaint does is it asks to
6  add to the complaint that was already dismissed with
7  accepting the allegations on the initial complaint.  And
8  she did that.
9      Q.  Where does it say that?
10      A.  In here it asks -- okay.  What it's doing
11  is that -- No. 2 is telling that the -- to -- instead of
12  taking over the whole complaint and this being the
13  initial complaint, to drop officers that the judge asked
14  me to drop and to add other officers to the complaint
15  that was already existing.
16      Q.  Mm-hmm.
17      A.  Okay.  Three is asking them to keep the --
18  certain officers as defendants and who to add to it.  And
19  No. 4 asked to include exhibits that weren't included in
20  the first initial complaint.  So it's an add-on to a
21  complaint that already existed.
22      Q.  She --
23      A.  She didn't accept the complaint as it was, so
24  I amended the complaint.  But I did not amend the

**Page 21**

1  complaint as this one totally dissolving the other
2  complaint.  What I did was I changed what the judge asked
3  me to change to be an acceptable complaint, and I added
4  and subtracted using this as the amended.  And she
5  accepted it that way.
6      Q.  How do you know that she accepted it that way?
7      A.  Because she gave me a motion and she approved
8  it.
9      Q.  Right.
10          But how do you know that she accepted
11  that as --
12      A.  Because she took the motion and accepted it as
13  a retaliation.
14      Q.  Right, right.
15          But I'm saying:  What did she say that
16  indicates that this isn't it; that there's something else
17  to it?
18      A.  As far as the other complaint being totally
19  dissolved?
20      Q.  Right.
21          Why isn't it this?  Why isn't this the
22  amended complaint?  What makes you think that the other
23  one is incorporated?
24      A.  The way I wrote this complaint up here, I

James St. Louis

Page 22

1  believe that this complaint doesn't negate the previous
2  complaint. What it does is it modifies the initial
3  complaint. And by modifying it with this amended
4  complaint, it molds the two complaints into one solid
5  complaint, which the judge accepted. That's my belief.
6      Q. Okay. Now, it sounds like what you're saying
7  is that this adds on to something else. What is the
8  first thing that's --
9      A. The initial complaint has to do with the
10  constitutional violations that were being adhered to in
11  the kitchen and asking for relief because of -- the
12  issues that weren't being addressed were in direct
13  violation of the federal government.
14      Q. Right.
15          But does the original complaint -- what
16  you had just -- a couple minutes ago you said was filed
17  in April of 2006.
18      A. Right.
19      Q. Is that when the original complaint --
20      A. That is the original right here.
21      Q. The one that's on the Section 1983 form?
22      A. Yes.
23      Q. Okay. All right. Why don't we start by
24  looking at this Exhibit 1. Can you look at the one I've

Page 23

1  given you? because this is going to be the one that's
2  going to be attached. Is that complete? Just glance at
3  it and see if it --
4      A. I have to look at my copy and see if it is a
5  complete copy.
6      Q. Okay. Just so you know, I downloaded that
7  from the docket, because that's what's in the docket.
8  But I want you to look at it and make sure everything is
9  there.
10      A. Yeah. It looks like it is.
11      Q. Okay. So just use mine, because, like I said,
12  that's the one that's going to be attached to the
13  transcript. All right. Go to where it says Exhibit A,
14  page 1.
15      A. Exhibit A?
16      Q. Mm-hmm. It's like the third page in, I think.
17  Or fourth. Let me see. It's the fourth. It's the
18  fourth page. Yeah. That's it.
19          Okay. In the first sentence, you say
20  that there was a meeting March 8th, 2005 with Lieutenant
21  Morris and Lieutenant Legates after St. Louis had
22  complained to Lieutenant Legates that constitutional
23  issue and threats and extortion being done by first cook
24  Govan --

Page 24

1      A. Govan.
2      Q. Okay.
3          -- on the third cooks under his
4  supervision.
5          Have I basically said what it says?
6      A. Right.
7      Q. Okay. Explain to me if I'm wrong about this.
8  It sounds like you had first complained to Lieutenant
9  Legates. Is that right?
10      A. First?
11      Q. Right. Before this March 8th complaint to
12  him.
13      A. No. I complained to Ms. Morris. I complained
14  to officers that were first -- Zone I officers that ran
15  the kitchen --
16      Q. Okay.
17      A. -- prior to Legates.
18          The reason I had gone to Legates is I
19  was getting no satisfaction from Lieutenant Morris.
20      Q. Okay. Now, who's Lieutenant Legates?
21      A. Lieutenant Legates is -- or I believe he was
22  the manager of the kitchen at the time. I'm not sure if
23  he did the management or if he did the -- well, he was
24  one of the lieutenants.

Page 25

1      Q. Okay.
2      A. He was one of the officers in the kitchen.
3      Q. When you said that he managed the kitchen, was
4  he security staff or was he --
5      A. I'm not sure exactly what he was.
6      Q. Was he --
7      A. I believe all of them are --
8      Q. -- cooking?
9      A. No. There's no officers that do any cooking
10  at all there.
11      Q. Do the inmates do all the cooking?
12      A. The inmates do all the cooking.
13      Q. Okay. Lieutenant Morris, was she a lieutenant
14  as well?
15      A. At that time, yes.
16      Q. And that's Cheryl Morris?
17      A. Yes.
18      Q. What was her role in the kitchen?
19      A. She does the hiring of the inmates. She does
20  the payroll. She is a shift supervisor, I believe, for
21  the p.m. shift.
22      Q. In terms of the chain of command, would
23  Legates have been above Morris?
24      A. I think they're equal.

James St. Louis

8 (Pages 26 to 29)

| Page 26 |
| --- |

1       Q.  Oh, okay.  It sounds like what you're saying
2   is that before you talked to Legates you talked to
3   Morris.
4       A.  Yes.
5       Q.  Is that right?
6       A.  Yes.
7       Q.  And you had complained about certain issues?
8       A.  Yes.
9       Q.  Do you remember when you first complained to
10  her?
11      A.  It's in the discovery the exact dates, because
12  I pulled out my calendar and sent you a copy of it.
13      Q.  Okay.
14      A.  But I'd have to look it up, because I don't
15  know it right off the top of my head.
16      Q.  Do you know if it was before March 2005 before
17  that meeting?
18      A.  We talked about this, yes.
19      Q.  Okay.  It was before this meeting.
20      A.  It was before this meeting, because we had a
21  meeting with all the cooks.  And we addressed it at
22  Ms. Morris's convenience in her office.  And she just
23  would not address it when the other cooks came forth and
24  said that they were being threatened and coerced and

| Page 27 |
| --- |

1   bribed by the first cook.  And she wouldn't -- that's why
2   I went to Lieutenant Legates, because Ms. Morris would do
3   nothing about it.
4       Q.  Okay.  Now, I just want to go into a little
5   more detail.  The issues that you were complaining
6   about --
7       A.  Mm-hmm.
8       Q.  -- related to First Cook Govan?
9       A.  It's not just First Cook Govan.  Because it's
10  not only happening on the p.m. shift, it's also happening
11  on the a.m. shift where there are not just the head
12  cooks but -- there was an incident with the head of
13  sanitation when Michael Knight was still in the office at
14  this prison here and was in charge of it and where the
15  head of the sanitation department was asking for sexual
16  favors and giving promotions to inmates for those sexual
17  favors.  And Michael Knight knew about it, because I went
18  to him and told him that I got propogized (phonetic).
19  And he did nothing about it.
20      Q.  All right.  First lets's --
21      A.  So it's not just --
22      Q.  Govan?
23      A.  -- Govan.
24          It's a situation that's been happening,

| Page 28 |
| --- |

1   and it's been happening for quite a long time.  And it's
2   just -- it's magnified immensely in the kitchen because
3   the officers there are just letting it go on and they're
4   not addressing the issue or -- as I was told in a meeting
5   with all the other cooks, the inmates in this prison have
6   no integrity whatsoever.  And I was told by a certain
7   officer -- and 13 other cooks were there at this
8   meeting -- that she didn't care if we got threatened, if
9   we got coerced or whatever we did, because the inmates in
10  this prison were a non-entity.  And that's a quote in
11  direct.
12      Q.  Was that Morris?
13      A.  Yes, ma'am, it was.
14      Q.  All right.  You said a lot of different
15  things.  I'm trying to --
16      A.  Mm-hmm.
17      Q.  -- go over the different issues.
18          Let's go back to the sexual issue.  You
19  said that was when Michael Knight was still working --
20      A.  Working, yes.
21      Q.  When was that?  What year?
22      A.  What year was that?  I'm not positive, but I
23  believe it was either the end of 2004, the beginning of
24  2005.  But I'm not sure.  It was just before Michael

| Page 29 |
| --- |

1   Knight got his promotion to McKee Avenue.  He was still
2   here as the top boss in the kitchen when this was going
3   on.
4       Q.  And you told him that the head of
5   sanitation --
6       A.  Mm-hmm.
7       Q.  Was that an inmate or an officer?
8       A.  It was an inmate.
9       Q.  Okay.  Was pressuring or coercing?
10      A.  He wrote me a letter asking to have sex with
11  him.
12      Q.  Okay.
13      A.  And he reported directly to Michael Knight.
14      Q.  Okay.
15      A.  Because Michael Knight handled the sanitation
16  department.  And I wasn't the only one that complained
17  about it, because he had done it to other people too.
18      Q.  Who was this inmate?
19      A.  It's in my discovery --
20      Q.  You --
21      A.  -- his full name.
22      Q.  Okay.  You won't tell me?
23      A.  It's in my discovery.
24      Q.  So you're not going to tell me?

James St. Louis

Page 30

1    A.  Not off the top of my head.

2    Q.  Okay.  Did the inmate just write to you and

3  say I want to have sex with you --

4    A.  Mm-hmm.

5    Q.  -- or was he saying, if you don't, I'll do

6  this and that?

7    A.  What he did was he wrote and said that, if you

8  do have sex with me, I will give you any job that you

9  want, and I will promote you to be the second in command

10  under me and you won't have to do any physical labor

11  whatsoever.

12    Q.  How many times did he write to you?

13    A.  Once.

14    Q.  Are you saying that once you got that letter

15  you went to Michael Knight?

16    A.  Yes.

17    Q.  What did Michael Knight do or say?

18    A.  I took the -- I believe he took the note.  I

19  have no idea what he did, because I put in a promotion

20  and got office sanitation.

21    Q.  You put in for a promotion?

22    A.  Promotion and got office sanitation.

23    Q.  Okay.

24    A.  They had wanted me from the beginning to be a

Page 31

1  cook, and I didn't want to be a cook.  From the beginning

2  I wanted to learn all the jobs from the floor up.  I was

3  hired by Sergeant White, who asked me to take the cook's

4  test right away, because I was a certified -- I was

5  certified at food services before I came in here.

6    Q.  Oh.

7    A.  Before I came in here, I went to classes and

8  was certified in food service.  And they didn't have

9  anyone here that was certified.

10    Q.  And you weren't interested in being a cook?

11    A.  Not at the beginning, no.

12    Q.  Why was that?

13    A.  Because I wanted to learn the whole kitchen

14  from the ground up.  I figured that it would be to my

15  advantage to know every aspect of the kitchen.

16    Q.  Why did you want to do that?

17    A.  Why did I want to do that?  I'm sentenced to

18  40 years in jail.

19    Q.  Okay.

20    A.  Unless my court endeavors overturn my case, I

21  plan that most likely I'm going to be here for a while.

22  And I believe it's the only way that you can help run a

23  sufficient kitchen or a kitchen that's going to do a

24  super job the right way.  You have to know all of the

Page 32

1  aspects of the job from the ground up.

2    Q.  So you talked to Michael Knight about this

3  issue with the other inmate --

4    A.  Uh-huh.

5    Q.  -- saying he would promote you.

6       And then you talked to, was it

7  Lieutenant Morris, about the demand?

8    A.  That was a while after that.  Lieutenant

9  Morris and I talked about First Cook Govan and along with

10  other cooks that were being threatened multiple times.

11  We had multiple meetings.  We talked and talked about it.

12  And she just point-blank said that Arthur Govan is her

13  first cook and no matter what he does he is the one

14  that's running the kitchen.  And whatever way he wants to

15  run the kitchen is fine with her, as long as he didn't

16  kill somebody.

17    Q.  And Govan was threatening you personally?

18    A.  Govan has threatened not only me but other

19  cooks that will come forth with the word "I will kill

20  you" more than once.

21    Q.  Did Govan threaten to kill you?

22    A.  Multiple times he has.

23    Q.  Okay.  Is that all he said?  Was there more to

24  it?

Page 33

1    A.  Well, I was asked multiple times to go to the

2  back room with him.  And a couple other people.

3    Q.  Are you saying that you think because you

4  refused his request that he was mad at you or threatened

5  you?

6    A.  I don't know if he was mad at me or what he

7  was.  Mr. Govan likes to run things his way.  The only

8  problem is that there's rules and regulations that you

9  have to follow and you can't take people's rights away

10  from them to satisfy your own needs.  And that's what

11  he's doing.

12    Q.  Is this right?  There were a number of

13  meetings with Lieutenant Morris with not just you but

14  other meetings saying that Govan is threatening?

15    A.  Exactly.

16    Q.  And she ignored it?

17    A.  There was nothing done.  It was brought point-

18  blank right to her:  What are you going to do?  And she

19  totally ignored the question and ignored the whole issue

20  totally, which a few of the inmates that brought their

21  request have since -- they quit the kitchen because of

22  that, because they fear for their safety.

23    Q.  You also mention extortion being done by --

24    A.  Yes.

James St. Louis

10  (Pages 34 to 37)

Page 34

1    Q.  -- Govan.
2         What did that involve?  What was he
3    doing?
4       A.  What he would do is tell a certain inmate --
5    if we are having spaghetti -- okay.  I don't know if you
6    know how a kitchen is, or commercial kitchen.  The pots
7    are a hundred-gallon pot.  When you make the spaghetti
8    sauce, you got a five-foot long paddle that you stir.
9    And it usually splashes all over us.  Spaghetti sauce on
10   this white doesn't come out.
11        Govan would tell cooks, especially those
12   who were really strong as far as their appearance --
13   clean uniforms and everything -- that if they did not
14   want to get any sauce that day and have a possibility of
15   sauce getting on them that they would have to pay him
16   some type of commissary, whether it be candy or honey
17   buns or whatever it was.  He was extorting commissary
18   from these inmates so he could change what their work
19   schedule was, because he was the one that did the work
20   schedules.  And those who refused to do that, he tended
21   to put them on the dirtiest jobs that you could possibly
22   do.  I've even seen him take an inmate and make him clean
23   the drains with a toothbrush because he refused to pay
24   him any type of commissary.

Page 35

1    Q.  You talked about -- if you look at the top of
2    page 2 -- this is the next page from what we were looking
3    at --
4       A.  Okay.
5    Q.  -- Govan offering questions and promotions to
6    inmates who paid him with commissary.
7         Now, this is beyond just job
8    assignments.
9       A.  Mm-hmm.
10   Q.  What is this about?  What you are talking
11   about here?
12      A.  Okay.  What was starting to happen -- when I
13   started to becoming second cook, or when I was first
14   being second cook, Cheryl Morris, Lieutenant Morris,
15   started a new program where the seconds cooks, which
16   there was three at the time, and the first cook would
17   interview perspective people to be promoted to being a
18   third cook, to come into the kitchen, which was a pay
19   raise and everything.
20        Well, what Arthur Govan was doing was he
21   was going to these individuals and saying what we were
22   supposed to do.  And I refused to do this.  I never did
23   it.  I never participated, because I believe it's not
24   part of an inmate's job to question and to hire other

Page 36

1    inmates.  And I told Cheryl Morris that to her face,
2    which did not set to well with her.  So I was not a part
3    of this whatsoever.
4         What she did was -- what she had him do
5    was -- the second cook that participated and Mr. Govan
6    drew up questions to ask these people as far as their
7    cooking experience and what they expect and what they
8    would get out of the job.  Now, it's a promotion not only
9    as far as an easier job, 9:00 to 5:00, but also includes
10   monetary.  You get more money for become a second or
11   third cook.
12        Now, what Govan was doing was he was
13   taking the people he wanted to be cooks, and, for
14   commissary or for favors, he was giving them the
15   questions ahead of time.  And if you paid him so much, he
16   would give you a good recommendation so you would be
17   hired in the cook station.  And I had people come forth
18   and say they were told that and were offered it by Govan.
19   Q.  Okay.  So you did not have that firsthand
20   experience?
21      A.  I did not -- I told Ms. Morris that I --
22   nothing of -- against her disrespectfully, but I did not
23   want to participate in questioning and hiring of inmates
24   for a promotion that I thought was a violation of the

Page 37

1    constitution.  Rather, it should be the officers that did
2    that, not the inmates, having that type of authority over
3    anybody to promote them or give -- have any type of an
4    idea when they would get a raise or advance in the
5    kitchen.  I didn't believe it was part of my job
6    description.
7    Q.  Do you know whether during these interviews --
8    was it just Govan or was it --
9       A.  Okay.  What --
10   Q.  -- just the staff.
11      A.  What happened was Ms. Morris would be in the
12   office -- in her office.  And they would take the second
13   cooks that were available, because we -- they all had
14   different days off -- and Mr. Govan, along with
15   perspective interviews or perspective third cooks -- call
16   them into her office.  And then they would ask them the
17   questions.  And then after they got done asking the
18   questions, she would ask them what their opinion was and
19   would they recommend and who would they rather have in
20   the kitchen as far as the third cook.  And nine times out
21   of ten she took the advice from Mr. Govan as to who he
22   wanted to come into the kitchen.
23   Q.  How do you know that?
24      A.  Mr. Govan would talk about it an awful lot.

Page 38

1  And so did the inmates that got hired. And they also
2  discussed how much they paid him to get their jobs.
3      Q.  You mean with --
4      A.  With commissary and stuff, yes.
5      Q.  In your discovery did you give me the names of
6  the witnesses that would --
7      A.  I --
8      Q.  -- explain these things?
9      A.  In my initial discovery I gave you eight
10  names.
11      Q.  Okay.
12      A.  Okay. Two of them -- one of them is my
13  godson. I sent you a letter a couple weeks ago.
14      Q.  Right.
15      A.  Okay. He was one of the ones that got fired
16  out of the kitchen and got transferred to another
17  institution.
18      Q.  Okay.
19      A.  Okay. After I sent you that -- those eight
20  names. Okay. The other one worked on the shift that I
21  was working on and was asked to give commissary and stuff
22  and was willing to come forth. Plus he was still giving
23  me information as to what was going on in the kitchen,
24  which he was terminated and transferred to another

Page 39

1  institution.
2          Now, the new names and all the discovery
3  that I just sent you is inmates that have come forth and
4  have offered what's happened to them in that kitchen.
5  Now, besides that, I've had other ones, probably 10 or 12
6  more that have come forth, that want to do some type of
7  deposition. But I have not taken anything from them in
8  writing or verbally. I just said, wait, let me talk to
9  you and get through this deposition first. And then
10  we'll go from there and see if I need anything more.
11      Q.  Okay. Do you know that the discovery cutoff
12  in this case is Monday?
13      A.  The deadline --
14      Q.  Yes.
15      A.  -- for discovery, yes.
16      Q.  Okay.
17      A.  I sent you my discovery that I have
18  up-to-date.
19      Q.  I guess what you're saying is you'll send me
20  more if you get it.
21      A.  If I get it. I haven't gotten anything more
22  at all.
23      Q.  Okay. And Govan was the head cook? First
24  cook? What's his title?

Page 40

1      A.  Govan is first cook. He still is.
2      Q.  Okay. What hours does he work? 7:00 to 3:00?
3      A.  Normally, the p.m. cooks, okay, work from
4  nine o'clock in the morning till 5 p.m.
5      Q.  Oh.
6      A.  Okay. Now, if there's -- they're so
7  shorthanded that a lot of the cooks will work overtime,
8  which would go to 7:00 or 7:30.
9      Q.  Okay.
10      A.  You work five days a week.
11      Q.  What does a first cook do? I don't mean what
12  Govan was doing personally beyond what he should have
13  been doing. But what kind of things does a first cook
14  do?
15      A.  First cook, as far as the institution is
16  concerned, okay, does the schedules of the cooks, the job
17  assignments on the cooks, supervises the cooks, and
18  writes reports up to Cheryl Morris for any disciplinary
19  action that he believes should be deemed. Plus, if he
20  has to adjust any of the recipes, he puts in his request
21  to Mr. Klein, and him and Mr. Klein discuss what needs to
22  be changed and the report that needs to be change and
23  then makes a decision as to menu changes.
24      Q.  You've gone over with me a number of issues

Page 41

1  that you said that you brought to the attention of
2  Department of Corrections staff.
3      A.  Mm-hmm.
4      Q.  Is there anything else that we haven't already
5  gone over in terms of you saying this is not right?
6      A.  Okay. Besides Cheryl Morris and this -- who
7  we've talked about already --
8      Q.  Mm-hmm.
9      A.  -- that this has been brought forth to, it
10  also has been forth to the institution itself here. The
11  warden has received copies of paperwork. The deputy
12  warden has. The disciplinary officers have all gotten
13  paperwork on it. So it's not just the seven defendants
14  that we're talking about. Others besides them have
15  gotten copies.
16          I have sent copies of paperwork, which
17  you asked in the discovery who else might have gotten
18  any, to the federal prosecutor's office, letting him know
19  what's going on. I have sent copies to the judicial
20  department of the legislators to let them know what's
21  going on. I have sent copies to The News Journal so they
22  know what's going on.
23      Q.  Okay. But other than the subject matter --
24      A.  Mm-hmm.

James St. Louis

12  (Pages 42 to 45)

Page 42

1    Q.  -- in terms of the substance of the issues
2    that you brought to the attention of these people, is
3    there any other subject matter that we haven't gone over
4    other than Govan and this maintenance supervisor?
5        You know, there are a number of things
6    you said, look, this is going on. Was there anything
7    else that was going on that you --
8    A.  Off the top of my head right now, I can't
9    think of anything.
10    Q.  What you're saying is that the issues that
11    we've just gone over you brought to the attention not
12    only of the defendants in this case but other people --
13    A.  Right.
14    Q.  -- as well that you just told me about.
15    A.  Yes.
16    Q.  And you're saying that was in writing?
17    A.  A lot of it was in writing. And it upset
18    Cheryl Morris immensely, because she came back and had a
19    meeting when she found out that other people were hearing
20    about these problems and not addressed with her. She
21    told me and the 13 cooks there that if this ever happens
22    again and something goes over their head they will get
23    fired and never have a job in this prison again and she
24    has enough influence in this prison to hold anybody from

Page 43

1    not getting a job. And she said that in the special
2    meeting that we had in the cooler.
3    Q.  Where?
4    A.  In the prep room, the cooler.
5    Q.  Okay. Do you know whether Govan knew that you
6    were complaining about him or bringing --
7    A.  Oh, yes. Yes, he knew.
8    Q.  Okay. What did he do?
9    A.  We -- he asked me why I wanted to protect
10    individuals that weren't related to me, and I told him
11    that -- my religious beliefs and everything is that I am
12    one that I just don't look after myself. I look after my
13    brothers too. And I believe that if someone is doing
14    something that's absolutely illegal and taking advantage
15    of individuals that shouldn't be taken advantage of that
16    it should be addressed. And I tried to address those
17    issues. Not that I was trying to be a Mr. Boss or
18    anything, because I was offered that job to be first
19    cook. And I turned it down.
20    Q.  Right.
21    A.  I did not want it at all. I did not want the
22    responsibility. I did not want the job description,
23    because I believe it's an illegal job as far as the
24    federal government is concerned. And I told them

Page 44

1    point-blank. Mr. Legates -- Sergeant -- Lieutenant
2    Legates asked me if I was interested in that job before
3    they gave it to Govan. I told them, no, I was not
4    interested at all and I did not want it.
5    Q.  And that was because of the interviewing
6    issue?
7    A.  Because of -- not the interviewing issue, the
8    job description. The job description was described. And
9    what the job description from the prison is a direct
10    controversy to what the federal law says. They describe
11    the job as being a supervisor job that does scheduling,
12    job description, job assignments and all that. And
13    that's illegal under the federal guidelines. You can't
14    do that. And I rejected that job because of those.
15    Q.  And you're talking about the idea that one
16    inmate is supervising another inmate?
17    A.  Exactly. You can't put an inmate in the
18    position where that could possibly happen. It's like
19    what happened in the last 30 days. They've had three
20    incidents in that kitchen right now, and one of them
21    involves a cooking paddle that -- a first cook went after
22    an individual, verbally abused him. And he thought he
23    was going to have a physical attack on his hands. So he
24    grabbed a paddle to defend himself. And if something is

Page 45

1    not done soon, there's going to be someone getting hurt
2    immensely, if not killed. And all this is documented,
3    but nobody does anything about it.
4    Q.  Where your complaint ongoing --
5    A.  Yes. It got to the point where it was getting
6    so bad that right -- two weeks before I got terminated --
7    okay. It was before Thanksgiving. Mr. Govan came in on
8    his day off, because we were short-handed. And there was
9    six cooks and myself were preparing a meal. And
10    Mr. Govan had said that, in front of everybody -- that
11    any cook who did not come in Thanksgiving Day would be
12    terminated. Now, he knew that three of my cooks -- or
13    our cooks that were working that day, besides myself, had
14    Thanksgiving Day off. I got upset and I addressed it
15    right to his face in front of all the cooks that he can't
16    do that. As an inmate, he can't fire or have inmates
17    fired because they don't want to come in on a holiday.
18        The issue got addressed to Sergeant
19    Johnson. Sergeant Johnson called Mr. Govan into the
20    office, addressed the issue and told him he can't do
21    that. It was a violation of the constitution and a
22    violation of the institution what he was doing.
23        Mr. Govan was so upset that he went
24    directly down to Ms. Morris's office, told her all about

James St. Louis

Page 46

1  it. She called me in and said, look, Govan is going to
2  run this kitchen the way he wants to run it, and that's
3  the way it is. And if you don't like it, you can leave.
4          And I had told her two weeks before
5  that: If there's going to be a problem and you got a
6  problem with me, I will step down from my position. The
7  only thing that I'm asking is that these constitutional
8  issues and the abuse that these inmates are getting from
9  First Cook Govan and these other cooks that are abusing
10  their powers to be taken care of and addressed. And they
11  just never got addressed. And two weeks later I was
12  accused of something that I never did and got terminated.
13      Q. So two weeks before you were terminated was
14  the issue where you went to Sergeant Johnson and said --
15      A. I didn't go to Sergeant Johnson. What
16  happened was another inmate went to Sergeant Johnson and
17  told him that he had been threatened with death and
18  threatened with being fired and that I stood up for the
19  inmates. And Sergeant Johnson called me in to talk to
20  him. I didn't go in to talk to him. And I told him to
21  his face, please, don't get involved in this; that we're
22  trying to get this settled through Lieutenant Morris.
23  But he called Mr. Govan in and discussed the issue with
24  him anyways and told him he can't do what he was doing;

Page 47

1  that's absolutely illegal. That's when Mr. Govan went
2  directly down to Cheryl Morris's office and told her
3  everything. And I got called out under the carpet and
4  told to knock it off and stop if I wanted to continue
5  employment there. And we were both put on probation for
6  a week.
7      Q. You and who?
8      A. Mr. Govan. Both.
9      Q. What does that mean?
10      A. Probation. You get written up; you're
11  terminated.
12      Q. Okay. Now, the Sergeant Johnson that spoke
13  with you, is that the Sergeant Johnson who's the
14  defendant in this case?
15      A. Yes, ma'am.
16      Q. What was his role in the kitchen?
17      A. He was Zone I officer.
18      Q. Okay.
19      A. The Zone I officer is the officer that's in
20  charge of the kitchen.
21      Q. Okay.
22      A. Even though there's a lieutenant there,
23  whoever the Zone I officer is runs the kitchen. He goes
24  to a lieutenant only if he has something that he can't

Page 48

1  handle.
2      Q. Lieutenant Morris had an office in the kitchen
3  area?
4      A. Okay. It was -- it wasn't where the cooks
5  were. It was off -- it was in the kitchen area, but it
6  was off to the side. She had her own office, yes. And
7  she still does to my knowledge.
8      Q. Is she the only --
9      A. Lieutenant that does?
10      Q. Well, correctional staff --
11      A. No.
12      Q. -- that has offices in there.
13      A. No. At that time -- I don't know how it is
14  now. But Lieutenant Legates had his own office. And
15  Lieutenant Lehman and Chris Klein share an office.
16      Q. Your Exhibit 1 references some things that
17  happened in March. Right? In the beginning, March --
18      A. Mm-hmm.
19      Q. Where did I put it? Oh, here it is.
20          March 8th, March 19th. And then a
21  little later on it talked about the time period when you
22  were fired. Right?
23      A. Mm-hmm.
24      Q. I guess which was in December of '05. Early

Page 49

1  December.
2      A. December 7th.
3      Q. Mm-hmm.
4      A. I gave -- that was the date they put on the
5  write-up. I never saw it or knew anything about it until
6  December 9th.
7      Q. Okay. Then you said that about two weeks
8  before you were fired there was this issue with
9  Thanksgiving.
10      A. Right.
11      Q. In between March and that Thanksgiving time
12  period, were you making these issues known to --
13      A. It was an everyday thing.
14      Q. Okay.
15      A. Every day that Govan worked there was a
16  problem.
17      Q. Did you bring this constantly to Lieutenant
18  Morris?
19      A. Yes, I did.
20      Q. Anybody else?
21          And I'm talking about this time period
22  from March to November.
23      A. I brought it -- many times I would talk to
24  Lieutenant Legates. And Legates told me point-blank,

James St. Louis

14 (Pages 50 to 53)

<table>
<tr><td colspan="2">Page 50</td></tr>
</table>

Page 50

1    hey, look, if you need someone to spout with or to talk
2    to or relieve the pressure, whatever, my door is always
3    open. Come in and talk to me. And I did. I kept
4    telling him everything that was going on and I kept
5    asking him, "Can you please do something? Can you take
6    care of this? Can you go over her head? Can you get
7    this taken care of? You know it's illegal. I know it's
8    illegal."
9            He said he didn't want to get involved
10   in it. But what he would advise me: As soon as I got my
11   case overturned, to go to the highest person in the
12   Department of Corrections and spill the beans on
13   Lieutenant Morris and tell them every single thing that's
14   going on, because he would back it all up then.
15           As far as him going to somebody, he said
16   he has to work there. And he wasn't going to get in the
17   middle and be an officer dubbed an insider, you know,
18   turning on another officer. He says he couldn't do that.
19   Q.   And you had multiple conversations along those
20   lines with Legates?
21   A.   Oh, I talked -- every couple of days we would
22   talk about problems that were going on and how to address
23   them and what to do, hoping that he would step up and go
24   to somebody in authority to get it taken care of. But he

Page 51

1    never did.
2    Q.   All right. Let's talk about the incident that
3    led to you being fired from the kitchen. Just tell me
4    what happened.
5    A.   Okay. I was -- I had a day off -- okay.
6    Let's -- I'm going to step back. Thanksgiving meal is a
7    special meal for everybody. We break out turkey, even
8    though it's not real turkey. It's compressed turkey.
9    But it's a big meal. And the institution -- the guys
10   really enjoy it. We put a lot of work into it.
11           Prior to that we've always gotten on
12   special meals a special bonus meal for the cooks and the
13   kitchen for doing such a good job. The institution, as
14   far as the kitchen institution part of it, would reward
15   us with a special meal.
16           We had asked, because we had such a --
17   I'm not going to say "we." Mr. Govan and Mr. Greenwell,
18   the two cooks, the first cook and the second cook, both
19   had gone to, I believe, Mr. Klein and had asked him,
20   because we had such an abundance of bread crumbs, that
21   could we have some bread pudding as our -- in our special
22   meal, because the guys really like it. And he, I guess,
23   had acknowledged to them, which Mr. Greenwell
24   acknowledged to me, that he had said, yes, we could,

Page 52

1    along with this special meal that we could have.
2            Through talking with Ms. Boring, I had
3    told her about the special meal that we were going to
4    have along with bread pudding. And she said, oh, that
5    bread pudding my grandmother used to make, but the way
6    she used to make it was she used to always put raisins in
7    it. She said, you know, could we put raisins in it?
8            I said -- I told her -- I said, look,
9    raisins are something that would have to be okayed by the
10   institution, because it's not something we get ordered
11   in. It's contraband. Okay. It's considered contraband.
12   So it would have to be approved. Okay. And personally,
13   I don't like raisins. I'm allergic to them. But she
14   says, well, you can make some without raisins. I said,
15   yes, I could. If it's all okay, we can do that.
16           So that was a couple weeks prior to
17   Thanksgiving. After we got done Thanksgiving, they were
18   talking about having our special meal. We had extra
19   spaghetti sauce that was left over from a meal. We
20   freeze it. We had 200 extra chicken patties left over
21   from a meal. We freeze it. They can stay frozen for a
22   certain amount of days. Then we have to throw them away.
23           I had asked the Zone I officer,
24   Mr. Johnson, if it would be all right, because it had to

Page 53

1    be thrown away within a couple days, if we could have
2    these chicken patties with sauce poured over them and
3    some cheese for a meal before I threw them away. And I
4    got an okay; that it was all right, because they were
5    going to be tossed away. I also asked if it was all
6    right to do the bread pudding, and he said, "Fine."
7            Now, Ms. Boring wanted the raisins in
8    it, and I told her -- now, I went to her after I had
9    talked to Mr. Johnson, because he was the Zone I officer
10   that okayed this. And I never said anything to
11   Mr. Johnson about raisins. But what I did was I came
12   back to Ms. Boring, because she had already said, no
13   matter what happens, she was going to e-mail Chris Klein
14   and get his approval for the raisins. So I went to
15   Ms. Boring and told her that the meal has been all
16   okayed; go ahead and e-mail Chris Klein.
17           The next day was my day off. I get
18   called in saying that there's a problem; that I had told
19   Ms. Boring that the raisins had been okayed by Chris
20   Klein, which I never did. I told her the whole meal had
21   been okayed, which it was, and that she had to e-mail
22   Klein to get the approval on the raisins.
23           The next day -- two days later was my
24   first day to come back to work. I came back to work.

James St. Louis

Page 54

1   This was after I got called in and I get a fact finding.
2   Cheryl Morris did a fact finding. I came into work. And
3   the second cook that was there told me that I was
4   terminated. I said, "What do you mean I'm terminated? I
5   got my pass. I'm here. Nobody has" -- he said, "Govan
6   terminated you. You don't work here anymore."
7           Lieutenant Lehman was there, and I went
8   to Lieutenant Lehman. I said -- I knocked on his door
9   and I asked him -- I says, "Lieutenant Lehman, I just got
10  told that Mr. Govan has terminated me, and I don't work
11  here in the kitchen anymore. Is that true?"
12          And he said, "Heck, no. Govan can't
13  terminate anybody. Go back to work. You're not
14  terminated at all."
15          So an hour later he calls me back into
16  his office and said, "Jim" -- he says, "I got some bad
17  news." He says, "I got information from Cheryl Morris
18  that I just got. You are terminated."
19          I said, "Well, I have no paperwork on
20  it. Can you pull me paperwork showing me why I'm
21  terminated? What's going on?"
22          He said, "Yes. Hang around. I'll get
23  it for you."
24          And 15 minutes later he pulled out of

Page 55

1   the fax machine a write-up dated two days prior saying
2   that I was terminated; that I had told Ms. Boring that
3   raisins were okayed by Chris Klein and that I had lied,
4   using my authority to get a reward of raisins because I
5   wanted them, which I'm allergic to them. And I don't
6   care if we had raisins or not. And I never said that.
7   And that's how I was terminated.
8       Q.  Okay. What was Mary Boring's role in the
9   kitchen?
10      A.  She was the sergeant. She basically ran
11  Zone I. They rotated as far as Zone I officer. She
12  would run Zone I maybe one or two days a week, plus she
13  ran serving lines. They had to have an officer with four
14  or five inmates to make sure that the right food went out
15  the windows to the inmates. And that was what she was
16  doing.
17      Q.  So she had kind of the same role as Sergeant
18  Johnson?
19      A.  Exactly. They were equal, basically.
20      Q.  What was Lieutenant Lehman's role there in the
21  kitchen?
22      A.  As far as I know, he was the manager, but he
23  basically worked -- he worked a shift that was an a.m.
24  partially into a p.m. shift. So we only saw him a couple

Page 56

1   hours here and there. We didn't see him every day. He
2   and Lieutenant Lehman would switch off working like a
3   midnight shift -- midnight to eight o'clock in the
4   morning or four o'clock in the morning till noon or
5   whatever that shift was. They'd shift back and forth.
6       Q.  So Lehman gave you the write-up?
7       A.  He handed me the write-up, yes.
8       Q.  Okay.
9       A.  He handed me a copy of the write-up.
10      Q.  Okay.
11      A.  And then we discussed the write-up itself in
12  his office.
13      Q.  Okay. What did that discussion involve with
14  Lehman, this is. Right?
15      A.  Lehman thought it was ridiculous and told me
16  to put in a grievance against it and that he believed the
17  actual truth would come out with the grievance being
18  heard.
19      Q.  Prior to this incident with the bread pudding
20  and raisins issue, had you dealt with Mary Boring before?
21      A.  Yes. We got along really well. As a matter
22  of fact, the funny thing is is she wrote me up for
23  contraband coming in. She had brought lasagna for me and
24  a couple other inmates just a week or ten days prior to

Page 57

1   this, which is contraband. And an officer brought it in.
2   And here she writes me up for contraband asking her to
3   bring me stuff when she brought in lasagna and contraband
4   ten days prior to all this write-up.
5       Q.  Do you think that Boring lied in her report?
6       A.  I think -- I know exactly -- I wrote to the
7   deputy warden about this incident.
8       Q.  That would be Deputy Warden Burris?
9       A.  David Pierce.
10      Q.  Oh, David Pierce.
11      A.  They assigned an officer to look into the
12  situation, and he went over and interviewed Ms. Boring.
13  And Ms. Boring told him that she was ordered to do the
14  write-up.
15      Q.  How do you know that?
16      A.  He told me.
17      Q.  Now, who's "he"?
18      A.  Bailey? It's in your discovery. The whole
19  paperwork is in there.
20      Q.  Okay. So let me back up.
21          You wrote to Deputy Warden Pierce?
22      A.  Pierce. To investigate this.
23      Q.  And that was done?
24      A.  Yes.

James St. Louis

16 (Pages 58 to 61)

| Page 58 |
|---|

1    Q.  And was it Bradley -- it's in here.  Let me
2  see.
3    A.  I think that's what his name is.  Bradley, I
4  think.
5    Q.  Morris ordered, per Lieutenant Bradley --
6    A.  Right.
7    Q.  -- to write St. Louis up.
8        It's at the bottom of page 2.
9    A.  Yep.
10   Q.  Is that who you're talking about?
11   A.  Yes.
12   Q.  Okay.
13   A.  He did the investigation, and he told me that
14  someone in the kitchen had it in for me and that this was
15  a retaliation claim.  That was his words.
16   Q.  So Bradley did the investigation, and then he
17  came and talked to you.  Is that right?
18   A.  Yes.
19   Q.  What did he tell you?
20   A.  He asked me how I wanted to proceed with it,
21  okay, because he had told me that by -- when he went over
22  to talk to Ms. Boring, that Ms. Boring said that she did
23  not want to do this write-up and that she was directly
24  ordered by Ms. Morris to do this and how to do it is what

| Page 59 |
|---|

1  he told her.
2    Q.  That's what Bradley told you?
3    A.  Bradley told me that and told me that the way
4  it looks to him is that someone in that kitchen has it
5  against me and wanted me out of there as a retaliation
6  and wanted to know how I wanted to proceed with the
7  investigation.
8    Q.  What did you say?
9    A.  I told him that I am proceeding as far as this
10  is an appeal.  He said that the institution really
11  doesn't have an appeal process; that they would put in a
12  disciplinary action.  And I told him to go ahead and put
13  in the disciplinary action but not as an appeal -- not as
14  a disciplinary action because it's not a disciplinary
15  action.  I've already been disciplined.
16   Q.  So when did the conversation with Bradley
17  happen?  Was it shortly after you were fired or a while
18  later?
19   A.  There is -- in the discovery it's got the date
20  and everything on that.  It was -- I put in a grievance.
21   Q.  Right.
22   A.  Okay.  The grievance officer said this was a
23  nongrievable incident.
24   Q.  Okay.

| Page 60 |
|---|

1    A.  They wouldn't hear it at all.  Okay.  That
2  took them a couple months to get that.
3    Q.  Mm-hmm.
4    A.  Okay.  So we're probably looking at May --
5  around May, 1st of June -- in there somewhere is when he
6  went to -- when he did the investigation.  They had to
7  wait until the grievance cleared first.
8    Q.  In the meantime before that happened, had you
9  had your disciplinary hearing?
10   A.  No.  There was -- no.  Well, what had happened
11  was Cheryl Morris had called me in on my day off.  I was
12  still employed.  Called me on my day off, had a fact
13  finders meeting with me and Lieutenant Lehman.
14   Q.  Okay.
15   A.  Okay.  The 9th -- okay.  The 8th was the fact
16  findings meetings.  Okay.  The 9th is when I came back
17  and was told that through the disciplinary procedure that
18  I was being terminated.  And that's when Lehman gave me
19  my write-up and marked it as being terminated.  And it
20  said, you know, disciplinary report.  Termination is what
21  it said.
22   Q.  Did you have a hearing in connection with
23  that?
24   A.  The only hearing that I had was the fact

| Page 61 |
|---|

1  finding that we had with Lieutenant Morris.  Now, on the
2  appeal that I had with the other officer -- okay.  I
3  asked for an appeal.  And they sent it through as a
4  disciplinary hearing.  They didn't send it through as an
5  appeal.
6        Now, Heavrin was the disciplinary
7  hearing officer.  He called me over.  I explained
8  everything.  As a matter of fact, I also offered at that
9  time to take a lie detector test that I did not say
10  anything about the raisins or mention raisins at all.
11  And Ms. Boring was offered to take a lie detector test.
12  And she said, no, she wouldn't do it.  Okay.  But I
13  offered to do it.  I said I am not lying.  I did not say
14  this.  It's a setup.  I would take a lie detector test,
15  but they wouldn't give me one.
16        His decision on the hearing was that I
17  was found guilty.  And the reason he said I was found
18  guilty is they have no authority over the kitchen
19  personnel at all and there was nothing they could do.  He
20  didn't believe I was guilty at all, but he had to have a
21  guilty verdict on that piece of paper so I could appeal
22  it.  And I told him, wait a second, this is an appeal.
23  It's not a disciplinary action.  It's an appeal.  He
24  said, "It doesn't matter.  This is how we're going to

James St. Louis

Page 62

1   handle this thing."
2          And they ended up giving me five days'
3   sanctions. And I was confined to quarters for five days.
4   He said, "I'm going to give you" -- because of this, I'm
5   going to give you the least amount of time I can give
6   you, which is five days confined to quarters, which is
7   what he gave me; because he told me I was already
8   punished for the actions. So I shouldn't be punished
9   again. But he punished me, anyways.
10      Q.   After the hearing with Heavrin --
11      A.   Uh-huh.
12      Q.   -- did you appeal that?
13      A.   Oh, yes.
14      Q.   Okay.
15      A.   And they told me it was not appealable.
16      Q.   Who told you that?
17      A.   The Bureau of Prisons --
18      Q.   Okay.
19      A.   -- told me it was a nonappealable -- and they
20   wouldn't let my witnesses come in or anything.
21      Q.   At the hearing?
22      A.   Yes.
23      Q.   And the confinement to quarters was in your
24   house unit at that time?

Page 63

1   A.   Yes.
2       Q.   Where was that?
3       A.   E Building.
4       Q.   E.
5          That's on the compound?
6       A.   Yes. Minimum security.
7       Q.   At some point you were moved to the MHU?
8       A.   Yes.
9       Q.   And --
10      A.   In July. A couple months later.
11      Q.   A couple months later.
12      A.   They said the reason for it was because of the
13   write-ups in the kitchen.
14      Q.   Mm-hmm.
15      A.   And they gave me 11 points for being fired out
16   of the kitchen.
17      Q.   Okay.
18      A.   And that put me in a position where I had to
19   go to maximum security.
20      Q.   So they were saying your classification
21   changed because of the discipline?
22      A.   Because of the action in the kitchen, yes.
23   Even though it was on appeal in the court system, they
24   still -- they said, no, we can't. We're still going to

Page 64

1   send you to MHU. Then once I got over to MHU, I spent
2   138 days.
3       Q.   Mm-hmm.
4       A.   And the court case progressed. I wrote to the
5   head counselor, Milbourn, and told him the whole
6   situation. And he said, no, we can't do this. We're
7   going to have a special classification. And then the
8   special classification brought me back out. He said what
9   they did to you was absolutely illegal. And they brought
10  me out here. And I'm supposed to be going into another
11  minimum security building, S1, as well. It's
12  classified -- a single cell.
13         But this counselor I have now doesn't
14  want to get involved in everything because of the civil
15  suit against officers in this prison. And she used to be
16  an officer. And she says, no, you can stay right where
17  you are until this is settled.
18      Q.   Who was the counselor that did the emergency
19  classification?
20      A.   Atallian.
21      Q.   Okay. Did your points go down?
22      A.   They wouldn't tell me.
23      Q.   Okay.
24      A.   I've asked for them.

Page 65

1       Q.   Mm-hmm.
2       A.   I've asked for what my points were and
3   everything else, and they won't give me any copy of
4   anything. They won't talk to me -- none of the
5   counselors.
6       Q.   So Delta East is not minimum?
7       A.   Delta East is not minimum. It's medium, I
8   believe. They keep changing classifications here every
9   month, so I'm not sure what they're doing.
10      Q.   Okay. You had mentioned something about the
11  appeal of your court case. Do you know what I'm
12  referring? While you were testifying a minute or so ago,
13  you talked about the appeal of your court case. Were you
14  talking about this?
15      A.   Yes.
16      Q.   Okay. This lawsuit.
17      A.   Yes.
18      Q.   Okay.
19      A.   See, when they got served the papers, it was
20  all over the whole prison --
21      Q.   Mm-hmm.
22      A.   -- that they got served the papers.
23         And that's when everybody started coming
24  to me -- inmates started coming to me, saying, "If you

James St. Louis

18 (Pages 66 to 69)

| Page 66 |
| --- |

1  need me to testify, I'll testify." But I didn't start
2  taking anybody names and all. I got enough names.
3           MS. KELLY: I want to mark this as
4  St. Louis 2.
5           (St. Louis Deposition Exhibit No. 2 was
6  marked for identification.)
7  BY MS. KELLY:
8      Q. Let me show you what's been marked as
9  St. Louis 2. Look it over and tell me if you recognize
10  it.
11     A. Yes. My grievance report.
12     Q. Does that look like the whole thing?
13     A. Yes.
14     Q. That's the grievance that you filed in
15  connection with this matter?
16     A. When I came back from the kitchen from talking
17  to Lieutenant Lehman and he said he would advise me to
18  file a grievance, this is the first thing I did -- was
19  filed this grievance.
20     Q. If you'll look at the second page, what does
21  that indicate?
22     A. It says it's nongrievable. It's a
23  disciplinary action. They wouldn't accept it.
24     Q. In your grievance do you talk anything about

| Page 67 |
| --- |

1  your complaints about constitutional violations?
2      A. I believe the only thing I talk about is the
3  firing and how that came about. I don't -- no, I don't.
4  No. The only thing I talk about is the incident itself
5  about being fired.
6      Q. Did you file an appeal in rejection of the
7  grievance?
8      A. You can't file an appeal on a rejection of
9  appeals?
10     Q. Okay. What makes you think that?
11     A. I've already tried it once before --
12     Q. Okay.
13     A. -- and they won't even accept it.
14     Q. This is a retaliation action. Is that right?
15     A. Yes, ma'am.
16     Q. Did the retaliation consist of you being fired
17  from your job?
18     A. I believe that's part of it, yes.
19     Q. What's the rest? Is there anything else?
20     A. I was -- I'm not a hero. I don't try to
21  pretend to be a hero or anything else. But there was a
22  lot of people in that kitchen that -- as Ms. Morris said,
23  there was two different groups. There was the St. Louis
24  group and there was the Govan group. And I had an awful

| Page 68 |
| --- |

1  lot of influence in that kitchen, not that I used that
2  influence for anything. The only thing that I was trying
3  to do was to make everybody have equal rights and be
4  treated like human beings. And when you have that type
5  of respect, a lot of people will -- they kind of wish
6  they had it themselves. So I think it was a more of not
7  just losing a job; it was the idea of knocking me down a
8  couple of steps and taking away, you know, some of the --
9  I don't know -- halo, or whatever you want to call it,
10  effect that I have.
11     Q. Any other ways in which you feel that you were
12  retaliated against?
13     A. The thing of it is is I think the biggest
14  problem is -- and it might be a lot -- and I shouldn't
15  probably say this. But maybe I didn't handle it exactly
16  right, because Ms. Morris doesn't like to be told how
17  things are supposed to be done. Even if she's wrong, she
18  doesn't like to be told it. She'd rather have someone
19  come forth with the idea that it's her idea that it
20  should be done a certain way or should be changed. And
21  never did that. I went and said, look, this is what the
22  law says. This is the way it's supposed to be done, but
23  it's not being done this way. And these people are being
24  treated like animals. And you can't do that. Well,

| Page 69 |
| --- |

1  that's something you don't do to Ms. Morris. And I guess
2  what I got out of it was, you know, she showed me.
3      Q. What I'm going to do now is go over, to
4  clarify, each of the defendants and have you explain to
5  me why you've named them as a defendant in this lawsuit,
6  and we're going to start with -- and we've already talked
7  about this a lot. But I just wanted to start with Cheryl
8  Morris. Why is she named as a defendant?
9      A. Most of this action, as far as the
10  constitutional violations and all of the complaints that
11  were not only from me but from other inmates, were heard
12  99 percent through Ms. Morris. She knows what was going
13  on in that kitchen. She saw what was going on in that
14  kitchen. Whether she will acknowledge it or whether she
15  will even -- well, she has already acknowledged, because
16  she told Heavrin that the constitutional issues are being
17  misused in the kitchen and that she's not going to change
18  it. And he told her that she had to change it. And
19  Chris Klein was there to, and he didn't step up and say
20  they were going to change it.
21           They were told point-blank that, not
22  only was it a constitutional issue, it's a violation of
23  the Department of Correction. And they both said that --
24  or, actually, Ms. Morris is the only one that -- they are

James St. Louis

Page 70

1  going to run it they're running it. Chris Klein never
2  said a word at all.
3          There's issues that were brought forth
4  that were never addressed and should have been addressed
5  and should not have gotten to the point of where they are
6  right now. And there's issues that are still going on
7  that, unless someone addresses them, someone is going to
8  get hurt immensely. And that's what I'm afraid of. And
9  there's no need for it at all.
10      Q. You mentioned a meeting with Heavrin?
11      A. Yes.
12      Q. What was that?
13      A. That was the disciplinary hearing.
14      Q. Okay. Do you feel that Cheryl Morris
15  retaliated against you?
16      A. Yes, I do.
17      Q. Okay. How so?
18      A. Yes, I do.
19      Q. How so?
20      A. Because she got to a point where she told not
21  only me but the other cooks in a meeting that anybody who
22  comes and makes a complaint to her and she doesn't handle
23  it -- if they go over her head, she will fire them. And
24  I went over her head. And she came back and did exactly

Page 71

1  what she was going to do. A month later she fired me
2  after that meeting. Or I got fired. She ordered
3  somebody to write me up for a specific reason that they
4  did not want to write me up for, which they already
5  acknowledged to another officer. And I got terminated
6  for something I did not do.
7      Q. All right. Now, let's talk about Christopher
8  Klein. Why did you name him as a defendant?
9      A. Again, he's in a position where he has seen
10  what has gone on in that institution. He was there when
11  an inmate and an officer got caught having sex in the
12  bathroom. And the inmate went to solitary confinement.
13  And the officer ended up being transferred to another
14  prison. He knows what's going on in that prison. He was
15  there. He has been an officer here. He has seen
16  everything that has been going on. He has come up in the
17  ranks. He hasn't taken it upon himself to fix the issues
18  that need to be fixed -- the constitutional issues. He's
19  just letting them slide without causing any problems.
20      Q. When was this issue with the officer having
21  sex?
22      A. It was in 2004 or 2005.
23      Q. Do you know who the officer was?
24      A. It's in my report.

Page 72

1      Q. Okay. In your discovery responses?
2      A. In my discovery packet -- the name and
3  everything.
4      Q. Do you feel that Mr. Klein retaliated against
5  you?
6      A. I believe an action is a retaliation by not
7  taking the bull, as you would say, by its horns and doing
8  your job and protecting my rights as a form of
9  retaliation. He's taking it upon himself to say that I
10  have no rights whatsoever and to let someone do whatever
11  they want to me. So if you're not with me, you're
12  against me. And I got the idea that he didn't defend me,
13  didn't do anything to protect me or any of the other
14  inmates. Yes, he's part of the retaliation.
15      Q. Do you know whether he had any role in your
16  actually being fired?
17      A. I have no idea. I know that everything that
18  supposedly goes through those offices are supposed to go
19  through him. I know that when I got terminated I wrote
20  him a letter explaining everything to him, yet there was
21  no hearing or anything. He never called me into the
22  office to talk about it. There was no discussion, no
23  investigation, on his part whatsoever.
24      Q. Shortly after you were terminated --

Page 73

1      A. Shortly after I was terminated, yeah, I wrote
2  him a letter explaining everything and telling him my
3  side of the -- the whole picture and what happened as far
4  as my point of view goes. And he never even acknowledged
5  it, never wrote me back, never investigated it. Nothing.
6      Q. The next defendant I want to ask you about is
7  Michael Knight. Why is he named?
8      A. Michael Knight, again, has gone through the
9  system. He was here in the prison. He has seen what
10  goes on. He was an officer here. He was brought up in
11  this prison. He's progressed through the steps to where
12  he is now. Again, through his inactivity -- and he knows
13  what has been going on, because we reported. He comes
14  into the kitchen all the time. We tell him what's going
15  on. And his inaction, again, makes him guilty as what
16  Cheryl Morris is. Or lack of his action, I should say.
17      Q. During the time period this happened -- these
18  things happened in 2005 -- was Mr. Knight in the kitchen?
19      A. At one point when this stuff was going on,
20  yes, Mr. Knight was in the kitchen. He had Chris Klein's
21  job.
22      Q. Okay.
23      A. And Chris Klein was a lieutenant. Especially
24  with the incident with the head of sanitation.

James St. Louis

20 (Pages 74 to 77)

Page 74

1    Q.  Do you think that Mr. Knight retaliated
2  against you in any way?
3    A.  I think he's part of it.  If you -- you can't
4  take a bull by its horns and come up with a solution and
5  take care of the problems, then you become part of the
6  problem.  And you're -- what he's doing was -- by not
7  acting at all, he's giving his approval to Cheryl
8  Morris's actions.  Yes, he's part of the retaliation.
9    Q.  Did he have any role, to your knowledge, in
10  you being fired?
11    A.  I have no idea at all.  I do know that e-mails
12  went out to Chris Klein.  And I believe they also went
13  out to him prior to and during termination.
14    Q.  How do you know that?
15    A.  I was told.
16    Q.  By?
17    A.  I was told by Ms. Boring that she e-mailed
18  Chris Klein and the main office.  So I'm assuming
19  anything that goes to the main office, where Chris Klein
20  was and Mr. Knight is, that Mr. Knight sees it.
21    Q.  Any other reason that he was named as a
22  defendant?
23    A.  Nope.
24    Q.  What about Harry Legates?  I think that's his

Page 75

1  name.
2    A.  Yes.
3    Q.  Why is he named?
4    A.  He has known every single thing that has gone
5  on in that kitchen through my conversations and through
6  other inmates' conversations.  And his absolute total do
7  nothing attitude in a position that he's in right now is
8  giving approval to Cheryl Morris, especially when we've
9  talked about how illegal the stuff that's being done is
10  and how constitutional violations were.  And by his
11  inactivity, he has given her credibility as far as her
12  actions.  And, yes, that makes him part of the
13  retaliation.
14    Q.  Do you know whether he had any role in your
15  being terminated from the kitchen?
16    A.  I couldn't tell you exactly for sure yes or
17  no.
18    Q.  Any other things you want to tell me about why
19  he has been named in the suit?
20    A.  No, ma'am.
21    Q.  What about Eric Lehman?
22    A.  Lehman is another one that -- he knows what's
23  going on.  He has talked to us.  He has talked to the
24  other second cooks when we were in there.  We told him

Page 76

1  what was going on.  He has said that he understands.
2  He's -- he didn't want to get involved because he was a
3  brand new lieutenant and he was at the bottom of the
4  totem pole.  He didn't want to cause any waves.  That was
5  what his words were.  He felt for us.  He gave us advice
6  as what to do and how to do it.  He gave us advice as far
7  as doing a grievance and everything.  But that's how he
8  would handle it.
9    Again, he was in a position where he
10  could have taken care of this and gone to the people that
11  would have handled it, and he didn't do that.  So through
12  his inaction and his being afraid, because of him being a
13  new kid on the block, yes, he's guilty of it.  He's
14  guilty of retaliation, because, again, he's giving
15  credibility to Cheryl Morris's actions, and they should
16  have never had that credibility.  Not from him, not when
17  he saw and knew exactly what was going on.
18    Q.  Do you know if he had any role in you being
19  fired?
20    A.  He was there when we had the investigating
21  meeting with Cheryl Morris, myself and he.  He was one of
22  the officers that was involved in it -- the two of them
23  and myself.  So I'm assuming that he was in all of the
24  fact finding meetings.  So I'm assuming -- and I'm not

Page 77

1  sure I should assume, but I'm saying that I believe he
2  would at least have had a vote.  Whether he voted for my
3  termination or whether he voted against it, I couldn't
4  tell you.  But I believe he would have had -- yes, he had
5  a part of it somehow.
6    Q.  He was part of the meeting with Morris where
7  she did this fact finding?
8    A.  Yes.  He was in the office participating in
9  it.
10    Q.  And that was what:  the 8th?
11    A.  The 8th.
12    Q.  Okay.  What does Sergeant Johnson look like?
13    A.  What does he look like?
14    Q.  Yeah.
15    A.  Sergeant Johnson is probably five-foot-six, a
16  light-skinned African.  Easy-going guy.  A little bit on
17  the heavy side for his size, I think.  Single, dark hair.
18  I don't know what else you want.
19    Q.  Okay.  Again, why is he named as a defendant
20  in this lawsuit?
21    A.  Well, again, through his inactivity and his
22  being Zone I officer and being involved in talking to
23  Mr. Govan and telling him that these things were illegal,
24  that he cannot do them -- and one of the bigger issues is

James St. Louis

Page 78

1   that, after this civil suit was filed, he solicited at
2   least three inmates, which one of them you have their
3   names, because he came forward and said you could use his
4   name, to have them discuss with me any way, means or
5   possible that they had to do to get me to change my mind
6   and drop this lawsuit.
7       Q.  You know this because the inmates he solicited
8   told you?
9       A.  They came to me and told me, yes.  And their
10  names are in the report that went to Lieutenant DeJesus.
11  And he was supposed to go in and investigate and talk to
12  them about it.
13      Q.  Who was?
14      A.  Lieutenant DeJesus.
15      Q.  When was this?
16      A.  June 9th, 2006.  The complaint was filed with
17  the prison system through the building sergeant who
18  called the lieutenant in charge, which was Lieutenant
19  DeJesus.  And the building sergeant filed the complaint
20  and gave it to the lieutenant, and the lieutenant took
21  the complaint, filed the complaint.  And where it went
22  from there I don't know.  I've already asked for that
23  complaint and the investigative, and they won't give it
24  to me.

Page 79

1       Q.  Do you feel that Johnson was involved in you
2   being fired?
3       A.  I really couldn't tell you for sure.  I don't
4   believe so, but I'm not positive.  I -- a lot of things
5   changed once inmates came to me and told me that he was
6   soliciting them to try to get me to squash the civil
7   suit.
8       Q.  All right.  The final person is Mary Boring.
9   Why is she named as a defendant?
10      A.  She knows what the truth is.  And through
11  Lieutenant Bailey, she admitted that she did not want to
12  do this write-up and that the write-up was false and that
13  she was ordered to do it through Lieutenant Morris.  And
14  she did admit that to me.  She admitted it to an
15  investigator from the state prison system.  Yes, she's
16  involved.  She's really involved.  If she can't stand up
17  for the truth, then she should be held accountable for
18  it.
19      Q.  And you feel that she's involved in you being
20  fired?
21      A.  Exactly.
22      Q.  Okay.
23      A.  Even though that she was ordered to do it, I
24  believe, yes, she is involved in it.

Page 80

1       Q.  You're claiming that you have suffered certain
2   harm due to the defendants' actions; is that right?
3       A.  Yes, ma'am.
4       Q.  Why don't you explain to me how you feel
5   you've been harmed?
6       A.  I spent many, many hours with Father Jackson,
7   talking to him about my emotional -- because I tried to
8   give that kitchen a hundred percent and tried to put out
9   the best possible meals that we could put out and protect
10  the rights of the inmates that are in there.  And
11  emotionally, it was very, very disturbing that I ended up
12  getting terminated for something that I did not do.  And
13  I've never had a write-up in this prison -- not one 24.
14  Nothing.  Never have I had a write-up anywhere.
15      Everything that I've gotten from that
16  kitchen has been rewards and certificates saying how
17  great a job I do and how great the meals were that I was
18  involved in.  And to have something like this happen,
19  yes, it's hurt me emotionally.  It stressed me out.  I
20  had a hard time sleeping.  I was getting headaches.  I
21  broke out in a rash that they were treating me for on my
22  arms and on my back and on my stomach.  Yes.  I was going
23  through a lot of emotional and mental stress.
24      Q.  Is this ongoing now?

Page 81

1       A.  It's cleared up right now.  Everything that --
2   the stress, mentally, has dissipated with my talk with
3   Father Jackson.
4       Q.  When did you talk to him?
5       A.  I was talking to Father Jackson from Day 1,
6   especially when I was in MHU.  I was talking to him at
7   least once a week over there, because he was making
8   special trips over to talk to me.  And we still talk now,
9   but not as much as we used to.  I'm at a point now where
10  I don't let it hurt me emotionally as much as it did
11  before.
12      Q.  You just testified that you had certain
13  manifestations of stress --
14      A.  Yes.
15      Q.  -- and so on.
16      How long did that go on approximately?
17      A.  I'd say the worst part of it was probably from
18  the time I got fired until at least when I moved out of
19  the MHU, which was November 2006.  After that it kind of
20  dissipated an awful lot as far as the medical and, you
21  know, the physical anguish part of it.
22      But the big thing now is -- I was in a
23  position where I worked in the kitchen for almost five
24  years.  I don't have money sent to me whatsoever.

James St. Louis

22 (Pages 82 to 85)

| Page 82 | Page 84 |
|---|---|

**Page 82**

1 Through my legal actions and everything, I'm $200 in the
2 hole right now. And I can't get commissary. I can't get
3 aspirins, anything medical that I would need. And that's
4 a big right now is it's hurting me financially,
5 especially when I get told that I -- because of this
6 lawsuit, I can't get employment. And that I'm
7 blacklisted even if I could anyways.
8     Q. Did you ask to be seen at the infirmary for
9 your different --
10     A. Yes.
11     Q. -- problems?
12     A. Yes.
13     Q. Were you seen?
14     A. Yes.
15     Q. Okay. Did they give you anything for your --
16     A. They --
17     Q. -- difficulty sleeping?
18     A. They started -- the only thing they were
19 working with is the rashes. They believed -- when I
20 first started getting them, they didn't know what caused
21 it at all. And through talking with the doctors and
22 everything, they believed it was because of stress and
23 because of having a hard time sleeping and everything.
24 It was emotional and stress both. And they gave me

**Page 83**

1 creams that I still have now, but I don't use them
2 anymore, because it's cleared up immensely. And I've
3 kind of, through my spiritual guidance with Father
4 Jackson, have let a lot of that go, and it doesn't bother
5 me the way it used to bother me.
6     Q. What makes you think that the rash was stress
7 induced?
8     A. I didn't. They did.
9     Q. Okay.
10     A. I never said that. The doctors said that.
11     Q. Okay.
12     A. The doctors believed it because they couldn't
13 account for it for any other reason. I've never had it
14 before. I never had it on my arms before. And they just
15 believed, because of the stress that I was going through
16 and the amount of sleep that I was losing and loss of
17 weight because I wasn't eating properly -- loss of
18 appetite and everything -- that that's why I was getting
19 the rash on my arms and on my back and on my chest.
20     Q. Do you remember which doctor it was?
21     A. The one that -- I didn't see a doctor until I
22 came out of the MHU. The only thing -- the only person I
23 saw while I was in the MHU was the nurse and nurse
24 practitioner, and I couldn't tell you what their names

**Page 84**

1 were. I never saw them before. I think they got their
2 own back their. And the doctors out here -- both of
3 them -- I've seen all of them out here.
4     Q. Okay.
5     A. Again, I asked them for the records when I put
6 in for the records for discovery, and they wouldn't give
7 them to me.
8     Q. You've given me some information about how
9 you've been harmed. Is there anything other than what
10 you've just told me about how you've been harmed by the
11 actions of the defendants?
12     A. I -- it -- I've been told by a couple inmates
13 to watch my back because of -- there's -- like I was
14 telling you before, in the kitchen there's the group
15 that's St. Louis and the group that's Govan. And
16 Mr. Govan doesn't appreciate -- he thinks he's being sued
17 and his name is included in this. And he's -- you know,
18 from what I understand, he's sent a couple of his friends
19 to talk to me. But I haven't seen anybody yet at all.
20 And nobody has come forth or said anything. So I just
21 take it as mute and let it slide. But it's still always
22 on your mind every time you walk the compound or go
23 anywhere that you're looking over your back all the time
24 wondering if, you know, you're going to get jumped or

**Page 85**

1 beat up because of, you know, the civil case that's going
2 on and the people involved.
3     Q. Do you feel concerned for your safety here?
4     A. Do I?
5     Q. Yes.
6     A. Definitely. You know --
7     Q. I mean with this lawsuit.
8     A. With this lawsuit I definitely do. And the
9 reason is I just found out some information I did not
10 know before. And that information is Ms. Morris's
11 children are from a high officer on this side of the
12 compound, not in the kitchen. And that a lot of the
13 favors that she gets done on the compound is through this
14 officer. And I don't know if it's the truth or not, but,
15 yeah, when you get an officer that's a captain and has a
16 lot of influence in this compound and you have a civil
17 suit against the mother of his children, yeah, you tend
18 to, you know, look over your shoulder an awful lot.
19     Q. Have you asked for any kind of movement
20 housing-wise for a more secure location?
21     A. I was told that I wasn't going to be moved
22 from this housing unit.
23     Q. Who told you that?
24     A. The counselor.

James St. Louis

Page 86

1    Q.  Okay.
2    A.  Thompson.
3    Q.  But have you asked to be moved?
4    A.  Yes.
5    Q.  To where?
6    A.  S1, single room.
7    Q.  Okay.  Is that --
8    A.  Minimum security.
9    Q.  Okay.  What are you asking for in this lawsuit
10   in damages or relief?
11       A.  What I put down was $20,000 per defendant.  I
12   asked for front pay.  I asked for sanctions against those
13   involved.  I asked for anything that the Court believes I
14   should get that I'm not asking for.  And I also ask that
15   20 percent of whatever is given or allowed to me as a
16   reward to be given to the hospital ministry in this
17   prison system.  I believe that's everything.
18       Q.  I believe that you said that in your discovery
19   responses you've given me are identified witnesses, the
20   names of witnesses that will testify on your behalf.  I
21   think you had indicated people previously as well.
22       A.  Mm-hmm.
23       Q.  So you've told me everything there is to tell
24   me about the witnesses?

Page 87

1    A.  Everything that I have right now.  See, I can
2    get more.  I have just not done it.  I have not gotten
3    the names.  People are offering me names every day.  I
4    say, no, I don't want them.
5    Q.  Okay.
6    A.  And this is stuff that's going on now.  They
7    want to tell me what's going on present day.
8    Q.  Okay.
9    A.  And I've got -- if there hasn't been 20, there
10   hasn't been one that didn't want to file a class action
11   suit.  They think they can just join the suit and make it
12   a class action, and I tell them no.
13       Q.  Do you have like a doctor that would testify
14   on your behalf about your rash or your physical issues?
15       A.  I think the doctor that's over there is
16   Van Dunk.  I know he'll come, because we already talked
17   about this.
18       Q.  Okay.
19       A.  And he's been the main doctor that's been
20   treating me.
21       Q.  Van Dunk?
22       A.  I think that's it.  Yeah.  I think it's
23   Van Dunk.
24       Q.  Other than the questions I asked you today,

Page 88

1    are there any other things or issues you want to present
2    to me about your lawsuit?
3        A.  I can't think of anything off the top of my
4    head.  You're going to get paperwork, by the way, that I
5    just sent in too.
6        Q.  Sent to the court?
7        A.  Sent to the court and to you.
8        Q.  Okay.
9        A.  It got mailed out this morning.  I'm going to
10   tell you.  It doesn't matter, because you're going to get
11   it anyways.  Motion to settle.
12       Q.  Okay.
13       A.  Mr. Johnson.
14       Q.  Okay.  I see what you're saying.
15       A.  Okay?
16       Q.  Mm-hmm.
17       A.  If that makes a difference.
18       Q.  Well, I'll get it when I get it.  That's filed
19   with the court, and then it pops up on the computer.
20           All right.  We've talked about discovery
21   cutoff that's coming up, and then summary judgment is due
22   in September.
23       A.  Mm-hmm.
24       Q.  You said that you want to read the deposition

Page 89

1    transcript --
2        A.  Yes, ma'am.
3        Q.  -- and go over and see if you have any
4    changes.
5            Let me just look through this real
6    quick.  I think that I'm done.
7            I don't have any other questions for you
8    today.
9        A.  Okay.  I have one more thing.  I had a
10   paralegal yesterday that had everybody in there -- all
11   the paralegals -- the guy who runs it -- the whole nine
12   yards -- and they advised me to bring to you, after we
13   get done all of this discussion, which we have finished,
14   that I am willing to sit down with the defendants and
15   discuss something that would take care of this without
16   having to go to court and dissolve this whole issue.
17           That is -- I haven't got a problem with
18   that, as long as it adheres to the fact that they're
19   going to address the constitutional issues and these
20   inmates are going to be taken care of the way they're
21   supposed to be and their rights are not violated.  I'm
22   more than willing to sit down without having to going
23   through District Court and make a settlement on this.  If
24   that's something they don't want to do and they want to

James St. Louis

24 (Pages 90 to 93)

**Page 90**

1  go to jury trial, that's fine with me too.
2    Q.  Okay.
3    A.  Because I'm not going anywhere, anyways.
4    Q.  It probably would be a good idea, if you have
5  some idea of what you want to do, to put that in writing
6  to me. That doesn't -- if there's --
7    A.  I -- you have what I have.  You asked me
8  point-blank what do I want.
9    Q.  Okay.
10   A.  That's what I want.
11   Q.  Okay.
12   A.  Now, if they're going to sit me there and give
13  me a counteroffer or say this -- which I already knew --
14  I mean, if I give you -- I could have sat down -- and I'm
15  trying to be totally honest.  Okay.  I could have sat
16  down and said I want a million this, a million that.
17  That's garbage.  All these guys are suing for millions
18  and millions.  That's not going anywhere and that's not
19  acceptable for anything.  I didn't ask for millions of
20  dollars.  I didn't try to get millions of dollars.
21        I'm not trying to be a rich man.  That's
22  not going to help.  And I'll tell you, honestly, if I end
23  up with $20,000 times six -- 120,000 -- most of that
24  money is going to be given away.  I can live on very,

**Page 91**

1  very little money.  And there's an awful lot of inmates
2  in here that need money.  And even when I was working in
3  the kitchen, I was knocking down close to a hundred
4  dollars a month.  And I was probably spending $10 a month
5  on myself and giving away $90 a month.  I was buying guys
6  coffee.  I was buying everybody, you know, different
7  stuff.  Not for any favors, because I never asked for
8  anything.  And I'm not going to use this money for my
9  benefit.  A hundred thousand dollars isn't going
10  anywhere, especially when I have kids.  I'm not looking
11  to -- all I want is what's right.  And if they can't do
12  what's right, fine, I'll go to court.  I'll go to court.
13   Q.  All right.  Is there anything else you want to
14  go over today?
15   A.  I'm fine on everything else.
16        MS. KELLY:  Okay.  We're all done.
17        (The deposition concluded at 12:15 p.m.
18  this same day.)
19        - - - - -
20
21
22
23
24

**Page 92**

1          INDEX TO TESTIMONY
2
JAMES ST. LOUIS                PAGE
3
  Examination by Ms. Kelly          2
4
5
      - - - - -
6
7
           INDEX TO EXHIBITS
8
9  ST. LOUIS DEPOSITION EXHIBIT NO.      PAGE
10  1  Motion for Leave to File an Amended      18
      Complaint per Judge Sue Robinson
11    Conclusion for Retaliation Claim
12  2  Grievance Form              66
13
14
      - - - - -

**Page 93**

REPLACE THIS PAGE
WITH THE ERRATA SHEET
AFTER IT HAS BEEN
COMPLETED AND SIGNED
BY THE DEPONENT.

# EXHIBIT B

| Incident# | |
|---|---|
| 1028348 | |

**DCC  Delaware Correctional Center**
**Smyrna Landing Road**
**SMYRNA DE, 19977**
**Phone#: 302-653-9261**

Date: 02/06/2007

# INCIDENT REPORT

| Group#: N/A | Type: Inmate Involved | Incident Date: 12/07/2005 | Time: 12:00 | Confidential: No |
|---|---|---|---|---|

Facility: DCC  Delaware Correctional Center                                        Followup Required : No

Associated Disciplinary Report #(s) 1022173

Incident Location: Bldg.14 Food Prep. Area

Location Description: Zone 1

Violated Conditions: 2.01/200.105 Abuse of Privileges
                              2.10/200.213 Lying

**Description of Incident:**

On the above date and approx. time Inmate James St. Louis was sitting at the picnic tables in Zone 1 and pulled me, FSSII Boring, aside and told me that chicken parmesan, and bread pudding was approved for workers chow for Thursday. He also said for me to bring in the raisins for the bread pudding. I asked him who approved the raisins and he replied "Klein." I asked him again if Klein approved the raisins. He said " well, Greenwell actually had the meeting with Klein." I told him I would speak to Greenwell. I went directly to I/M Greenwell and proceeded to ask him if the bread pudding was approved by Klein. He said" yes." I then asked him "were the raisins approved by Klein?" He said that raisins never came up in the conversation. I then told Greenwell that ,"that's what I thought," and "I will e-mail Mr. Klein myself and ask him." Before all this happened, approx. 2 weeks ago Inmate James St. Louis said that he will be making bread pudding. I mentioned to him  that too bad there won't be raisins in it. He then asked if I could bring some in? I, sarcastically stated to him if you can get the raisins approved, I will bring them in.....knowing that they would not be approved.EOR

| Injured Persons | Hospitalized | Nature Of Injuries |
|---|---|---|
| N/A | N/A | N/A |

Evidence Type: N/A                                                          Date Collected: N/A

Discovered By : N/A                                      Secured By: N/A

Type of Force Used []   PHYSICAL   []   CHEMICAL []   STUN []   OTHER   []   CAPSTUN [X]   NONE

Restraints Used     : N/A

Immediate Action Taken:
404 written

| Individuals Involved | | | |
|---|---|---|---|
| Person Code | Name | SBI# | Title |
| Staff | Mary, Boring M | N/A | FS Specialist I & II |
| Inmate | James, Stlouis J | 00446518 | N/A |

Reporting Officer: Boring, Mary M (Fs Specialist I & Ii)            Entered By: Boring, Mary M (Fs Specialist I & Ii)

| Approval Information | |
|---|---|

[ X ] Approved  [ ] Disapproved  Date: 12/08/2005  Approved by: Morris, Sheryl M  (Fs Kitchen Supervisor)

Comments: N/A

# EXHIBIT C

**Disciplinary#**
1022173

DCC Delaware Correctional Center,
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 02/06/2007

# DISCIPLINARY REPORT

| Disciplinary Type: Class1 | Housing Unit: Bldg D-EAST | | IR#: 1028348 | |
|---|---|---|---|---|

| SBI# | Inmate Name | Inst. Name | Location Of Incident | Date | Time |
|---|---|---|---|---|---|
| 00446518 | Stlouis, James  J | DCC | Bldg.14 Food Prep. Area | 12/07/2005 | 12:00 |

**Violations:** 2.01/200.105 Abuse of Privileges, 2.10/200.213 Lying

**Witnesses:** 1. Greenwell, Bryon        2. Morris, Cheryl        3. Johnson, Andre

### Description of Alleged Violation(s)

On The Above Date And Approx. Time I/M James St. Louis Was Terminated For Lying And Abuse Of Privileges/M  James St. Louis Told Me, Fssii Boring That Chicken Parmesan And Bread Pudding W/ Raisins Was Approved By Director Klein. I/M Lied To Me Fssii Boring About The Approval Of The Products.

**Reporting Officer:** Boring, Mary M (FS Specialist I & II)

### Immediate Action Taken

**Immediate action taken by:** Boring, Mary M -FS Specialist I & II

404 Written

### Offender Disposition Details

**Disposition:** N/A                    **Date:** N/A        **Time:** N/A        **Cell secured?** No

**Reason:** N/A

**Disposition Of Evidence:** N/A

### Approval Information

**Approved: [x]    Disapproved: [ ]   Approved By:** Lee, Bradley  Jr.(Staff Lt./Lt)

**Comments:** N/A

### Shift Supervisor Details

**Date Received:** 02/15/2006        **Time:** 13:57        **Received From:** Lee, Bradley  Jr.

**Shift Supervisor Determination:**

[] Upon reviewing this Disciplinary Report, I conclude that the offense may be properly responded to by an immediate revocation of the following privileges(see reverse side) for _____ hours not to exceed 24 hours)

[X] Upon reviewing this Disciplinary Report, I conclude that the offense would be properly responded to by Disciplinary Hearing.

_____

Lee, Bradley  Jr.(Staff Lt./Lt)

I have received a copy of this notice on **DATE:**_____ **TIME:** _____ and have been informed of my rights to have a hearing and to present evidence on my own behalf. I understand, if found guilty, I will be subject to imposition of sanctions outlined in the Rules of conduct.

**Preliminary Hearing
Officer:** _____        **Offender:** _____
      Lee, Bradley  Jr.                                 Stlouis, James  J

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

## DISCIPLINARY HEARING DECISION

**Inmate** :  Stlouis, James J                                  **SBI#:** 00446518          **Type:** Class 1

**Institution:** DCC  Delaware Correctional Center          **Hearing Date:** 02/23/2006    **Time:** 12:37

**Inmate Present:** Yes          **Reason(If No):** N/A

**Violation:**  2.01/200.105 Abuse of Privileges, 2.10/200.213 Lying

**Inmate PLEA: Not Guilty**

**Inmate Statement:**  Because I didn't do what she said I did.

**Witness Name:** Greenwell, Bryon

**Testimony :** Lt. Morris state's Mr greenwell said nothing about raise for bread pudding
          Sgt. johnson, Andre state's He know nothing of this bread pudding W/Raisins

**Witness Name:** Morris, Cheryl

**Testimony :** N/A

**Witness Name:** Johnson, Andre

**Testimony :** N/A

**Decision :** Guilty

**Rational :** Accuser state's I/M said he got the approved from Mr. Klein. After listen to Lt. Morris an Sgt. Johnson I find I/M Guilty
of all charges

**Sanctions:** N/A

### HEARING OFFICER'S SIGNATURE _____

Heverin, Ralph

I understand that I may appeal the decision of a Class II Hearing  to the Class I Hearing  Officer.I may appeal the decision of a
Class I Hearing  to the facility administrator.I also understand that I have 72 hours to submit my notice of appeal in writing to the
Class I Hearing Officer if I am appealing a Class II Hearing decision or the Warden if I am appealing a Class I Hearing decision.

**I [X]    DO    [ ]    DO NOT INTEND TO APPEAL**        _____

**INMATE's SIGNATURE**

### ORDER TO IMPLEMENT SANCTIONS

[ ]    Inmate does not wish to appeal          [X]    Appeal has been denied by Commissioner or Designate

[ ]    Sanctions have been modified          [ ]    Time Limit(72 Hours since hearing) for appeal has expired

It is here by ordered to implement the sanctions:

| Sanctions | Start Date | Days | End Date |
|---|---|---|---|
| 1. Confinement to Quarter | 04/10/2006 | 5 | 04/14/2006 |

**Page 1 of 1**

DCC  Delaware Correctional Center                                    Date: 02/06/2007
Smyrna Landing Road
Kent, DE, 19977
Phone#: 302-653-9261

## DISCIPLINARY HEARING APPEAL FORM

**Inmate** :  Stlouis, James J                          SBI#: 00446518        **Type:** Class 1

**Institution:** DCC  Delaware Correctional Center          **Hearing Date:** 02/23/2006    **Time:** 12:37

### RE: DISCIPLINARY HEARING

You have the right to appeal the decision of the Hearing officer to the Commissioner of the Department of Correction, or his designee. Execution of any sanction imposed by the hearing officer shall be automatically stayed for Seventy-Two(72) hours immediately following the hearing **(UNLESS) YOU INDICATE ON THIS FORM THAT YOU DO NOT WANT** to appeal. If You do not file an appeal within seventy-two (72) hours, or if you indicate on this form that you do not want to appeal, the sanction shall be carried out immediately.

  **[X]**  Yes, I do want to appeal.     **[ ]**  No, I do not want to appeal.

**I want the decision of the Hearing  Officer to be :**

  **[X]**  Reversed, and/or          **[ ]**  Remanded for further Proceedings.

**My reasons for making this appeal are :**

I did not say Klein ok'd it, I said I/M Greenwell and I/M Givan met with Klein and ok'd bread pudding. When I told Ms. Boring meal was ok'd I met your one and to see Greenwell and Givan about raisins because I didnt talk to Mr. Klein about bread pudding. The fact finding infomation wasnt supplied me and I/M greenwell and I/M Govan werent there to testifiy to what happened.

**DATE:** 02/06/2007                          **SIGNATURE:** _____
                                                          Stlouis, James  J

**To file this appeal, give it to** Heverin, Ralph

**\* The 72-hour time limit will run only while you are incarcerated.**

DR# 1022173

DCC  Delaware Correctional Center
Smyrna Landing Road
SMYRNA DE, 19977
Phone No. 302-653-9261

Date: 03/02/2006

| Inmate : Stlouis, James J | SBI#:00446518 | Type:Class 1 |
|---|---|---|
| Institution:DCC  Delaware Correctional Center | Hearing Date:02/23/2006 | Time: 12:37 |

## MEMORANDUM

To  : Stlouis, James J

From : Chief, Bureau of Prisons

RE  : APPEAL DECISION

1. **Confinement to Quarter**

| Your appeal | [ ] | Accepted | [X] | Denied |
|---|---|---|---|---|

| The decision of hearing | [X] | Affirmed | [ ] | Reversed | [ ] | Remanded for further proceedings |
|---|---|---|---|---|---|---|

The sanction imposed by hearing officer will  [X]  Remain as imposed by the Hearing Officer [ ]  Reduced

The basis of this decision is as follows :

The reports support the guilt. your appeal contains no evidence to support a change.{SLD}

This report has been reviewed by Rendina, Anthony J

Date Reviewed 03/02/2006

letter sent
dissappointment
journal
attorney

# EXHIBIT D

**EXHIBIT**

St. Louis 2

RWWR 8.10.07

FORM #584

**GRIEVANCE FORM**

#22285

FACILITY: _Bldg. 14 Food Prep Area_     DATE: _12/10/05_

GRIEVANT'S NAME: _JAMES St. Louis_     SBI#: _00446518_

CASE#: _disciplinary # 1020115_     TIME OF INCIDENT: _Report 12:00_

HOUSING UNIT: _E_

BRIEFLY STATE THE REASON FOR THIS GRIEVANCE. GIVE DATES AND NAMES OF OTHERS INVOLVED
IN THE INCIDENT OR ANY WITNESSES.

_See sheet included (3) to explain grievance._

ACTION REQUESTED BY GRIEVANT: _Appology from Ms Boring and reinstatement and back pay from main kitchen and stricken from my record._

GRIEVANT'S SIGNATURE: _James St. Louis_     DATE: _12/10/05_

WAS AN INFORMAL RESOLUTION ACCEPTED?     _____(YES)     _____(NO)

(COMPLETE ONLY IF RESOLVED PRIOR TO HEARING)

GRIEVANT'S SIGNATURE:_____     DATE:_____

IF UNRESOLVED, YOU ARE ENTITLED TO A HEARING BY THE RESIDENT GRIEVANCE COMMITTEE.

cc: INSTITUTION FILE
     GRIEVANT

April '97 REV

RECEIVED
DEC 13 2005
Inmate _____ Office

## Instructions for Submitting a Regular Grievance

Inmates are required, per DOC Procedure 4.4 [Inmate Grievance Procedure] to attempt to resolve complaints prior to filing a regular grievance. Grievances are to be submitted within seven(7) days from the date of the occurance or incident or within seven days after the inmate became aware of the incident. The grievance is to be placed in the grievance box located in each housing unit.

Only one issue per grievance form will be addressed. If the grievance is submitted on a weekend or a holiday, it will be recieved during the next working day.

---

### Return of Unprocessed Grievance

Intake Action: This Grievance Form is being returned to the inmate under the provisions outlined in DOC Procedure 4.4 "Inmate Grievance Procedure" for the following reason(s):

_____ **Vulgar/Abusive or Threatening Language.** The language that is unacceptable has been highlighted. The grievance may be resubmitted omitting this language.

✓ **Non-Grievable.** This issue has been defined as non-grievable in accordance with DOC Policy 4.4. These procedures have their own appeal process that must be followed. ✓ Disciplinary Action _____ Parole Decision _____ Classification Action  *1022173*

_____ **Request.** Requests are not processed through the grievance procedure. Please correspond with the appropriate office to secure the information that is requested.

_____ **Duplicate Grievance(s).** This issue has been addressed previously in Grievance #_____.

_____ **Original Grievances** must be submitted to the Inmate Grievance Chairperson. Photocopies are not accepted.

_____ **Inquiry on behalf of other inmates.** Inmates cannot submit grievances for other inmates.

_____ **Expired filing period.** Grievance exceeds seven(7) days from date of occurrence.

_____
Inmate Grievance Chairperson

1-10-06
Date

Form#: 584 (F&B)
(Reverse Revised July '99)

22285

12/9/05    9:50 AM

left Building E to go to kitchen to work
upon entering kitchen I handed my pass to officer Wagner
and proceeded into kitchen to coat room and then to
set up for todays work. After getting the count and
needs for diet cooks I noticed a sign up on the
zone one office for 2nd cooks. I saw I/M Coles
and asked him about it. He explained that I was
terminated and he was told to run the floor.
I proceeded to Lt. Lehman's office and upon entering
asked him if I was terminated. He said he just
received an E mail outlining suspension pending
termination if out come of hearing. And told me
spec. Boring wrote up this order. I asked him
what for and could I get a copy of it. He proceeded
to enter his computer and gave me a copy of said
order. We talked for awhile and he said his advise
to me is chill for awhile and greive it, and was
sure the truth would come out sooner or later.
I left and went back to my building were I
noticed the write up was dated 2 days ago
at noon.

facts:
#1. Around Thanksgiving time we (cooks) were
preparing a Thanksgiving day meal and Ms. Boring
asked if we were going to have bread pudding
I responded and told her no we were haveing
sweet potatoe pie instead. She said she always

22285

adds raisins to her bread pudding and wouldn't it be nice if we could do it here. I told her probably but I didn't know when we were going to have it. She asked me to let her know so she could bring in some raisins for workers chow and I said I would. In the mean time Mr. Greenwell (a second cook) told me Mr. Govan (1st cook) and himself met with Mr. Cline (head of kitchen) and was told if we had enough bread after making stuffing for Thanksgiving he could do bread pudding sometime. Now two weeks ago we had chicken patties and had 200 left over from lunch which I put in the freezer. And last Monday we had spagelti and meat sauce left over from dinner that was put in the cooler. I said to Mr. Govan it would be nice if this week we had chicken patties w/sauce and bread pudding and he agreed says ask zone one if we can do it Thursday seeing it is a terrible meal. I proceeded to zone 1 and asked officer Johnson if he was incharge Thursday and he said yes. And I asked to run something by him I told him of Greenwells conversation about Kline oking bread pudding

22285

and I told him about the chicken
patty and sauce and ask if it would
be alright with him if we had them
Thursday and he said it was OK.
Upon leaving zone one I saw
Mp. Boeing and told her we were
having Bread pudding and chicken patty
and sauce Thursday and she said she
wanted to bring in raisins. I told her
to talk to Mr. Greenwell because he
had Klines permission and that she
should clear it through him. She
immediately went to Greenwell and
discussed the issue upon completion
told me she was going to deck Mr Kline
The next thing I know I have Wendsday
off but worked ½ a day (which was
the 7th worked to 1pm) and no one said
anything to me. Thursday I was called
into the kitchen at 1:30 pm to see
Lt Morris and Lt. Lehman to answer
questions about the supposedly meal.
I did not go into work Thursday because
I was told by 3rd cooks Wendsday
night at 5 pts that the meal was
cancelled and was asked if I was
OK. No one mentioned the write
up or suspension until this AM.

12/8

# EXHIBIT E

Westlaw.

Not Reported in F.Supp.2d                                                        Page 1

Not Reported in F.Supp.2d, 2005 WL 2365276 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Fox v. Taylor
D.Del.,2005.
Only the Westlaw citation is currently available.
    United States District Court,D. Delaware.
            Linda Sue FOX, Plaintiff,
                        v.
    Stanley TAYLOR, Paul Howard, Patrick Ryan,
 Michael Knight, Emanuel Walker, Antrone Dorsey,
  Eugene Scott, Anita Cruz, Andre Johnson, Annette
  Edwards, and Colleen Shotzberger, Defendants.
            **No. Civ.A.04-1257 KAJ.**

                   Sept. 27, 2005.

Linda Sue Fox, New Castle, DE, pro se.

JORDAN, J.
*1 Plaintiff, Linda Sue Fox ("Fox"), is a *pro se*
litigant who is presently incarcerated at Baylor
Women's Correctional Institution located in New
Castle, Delaware ("Baylor"). She filed this action
pursuant to 42 U.S.C. § 1983 and requested leave to
proceed *in forma pauperis* pursuant to 28 U.S.C. §
1915.

### I. STANDARD OF REVIEW

Reviewing complaints filed pursuant to 28 U.S.C. §
1915 is a two step process. First, the Court must
determine whether Fox is eligible for pauper status.
The Court granted Fox leave to proceed *in forma
pauperis* on October 12, 2004. (Docket Item ["D.I."
] 5.) In that same order, the Court assessed Fox a
$150.00 filing fee, and ordered Fox to pay a partial
filing fee of $35.81 and file an authorization form
within thirty days. Fox filed the authorization form
on November 16, 2004, and the filing fee was
received on April 7, 2005.[FN1] (D.I.8.)

FN1. Although Fox filed the authorization
form and paid her filing fee after the
thirty-day deadline, the complaint was not
dismissed before the authorization form
and payment were actually filed, nor will I
dismiss it on those grounds here.

Once the pauper determination is made, the Court
must then determine whether the action is frivolous,
malicious, fails to state a claim upon which relief
may be granted or seeks monetary relief from a
defendant immune from such relief pursuant to 28
U.S.C. §§ 1915(e)(2)(B)-1915A(b)(1).[FN2] If the
Court finds Fox's complaint falls under any one of
the exclusions listed in the statutes, then the Court
must dismiss the complaint.

FN2. These two statutes work in
conjunction. Section 1915(e)(2)(B)
authorizes the Court to dismiss an *in forma
pauperis* complaint at any time, if the
Court finds the complaint is frivolous,
malicious, fails to state a claim upon which
relief may be granted or seeks monetary
relief from a defendant immune from such
relief. Section 1915A(a) requires the Court
to screen prisoner *in forma pauperis*
complaints seeking redress from
governmental entities, officers or
employees before docketing, if feasible
and to dismiss those complaints falling
under the categories listed in § 1915A(b)(1)

When reviewing complaints pursuant to 28 U.S.C. §
§ 1915(e)(2)(B)-1915A(b)(1), the Court must apply
the standard of review set forth in Federal Rule of
Civil Procedure 12(b)(6).*See Neal v. Pennsylvania
Bd. of Prob. & Parole,* No. 96-7923, 1997 WL
338838 (E.D.Pa. June 19, 1997) (applying Rule
12(b)(6) standard as the appropriate standard for
dismissing claims under § 1915A). Accordingly, the
Court must "accept as true factual allegations in the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 2

Not Reported in F.Supp.2d, 2005 WL 2365276 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

complaint and all reasonable inferences that can be drawn therefrom."*Nami v. Fauver,* 82 F.3d 63, 65 (3d Cir.1996) (citing *Holder v. City of Allentown,* 987 F.2d 188, 194 (3d Cir.1993)).*Pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" and can only be dismissed for failure to state a claim when "it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." ' *Haines v. Kerner,* 404 U.S. 519, 520-521, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

The United States Supreme Court has held that, as used in § 1915(e)(2)(B), the term "frivolous" when applied to a complaint, "embraces not only the inarguable legal conclusion but also the fanciful factual allegation."*Neitzke v. Williams,* 490 U.S. 319, 325, 109 S.Ct. 1827, 104 L.Ed.2d 338 (1989). [FN3] Consequently, a claim is frivolous within the meaning of § 1915(e)(2)(B) if it "lacks an arguable basis either in law or in fact."*Id.* As discussed below, Fox's claims have no arguable basis in law or in fact, and shall be dismissed as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b)(1).

FN3.*Neitzke* applied § 1915(d) prior to the enactment of the Prisoner Litigation Reform Act of 1995 (PLRA).Section 1915(e)(2)(B) is the re-designation of the former § 1915(d) under the PLRA. Therefore, cases addressing the meaning of frivolous under the prior section remain applicable. *See* § 804 of the PLRA, Pub.L. No. 14-134, 110 Stat. 1321 (April 26, 1996).

## II. DISCUSSION

**\*2** Fox filed her original complaint alleging that her First, Eighth and Fourteenth Amendment rights were violated by Defendants Stanley Taylor (" Taylor"), Paul Howard ("Howard"), Patrick Ryan (" Ryan"), Michael Knight ("Knight"), Emanuel Walker ("Walker"), Antrone Dorsey ("Dorsey"), Eugene Scott ("Scott"), Anita Cruz ("Cruz"), Andre

Johnson ("Johnson"), Annette Edwards ("Edwards" ), and Colleen Shotzberger ("Shotzberger") (collectively "Defendants").[FN4] (D.I. 2 at 6). Fox alleges that Defendants "conspire[d] to have Plaintiff removed from her position" as Senior inmate Office Clerk in the kitchen at Baylor. (*Id.* at 5.) Fox claims that Defendants discriminated against her and harassed her, and that when she lodged verbal and written complaints, Defendants retaliated against her by having her suspended and then fired. (*Id.* at 5-6.)

FN4. On October 14, 2004, Fox filed a motion to amend her original complaint, adding Colleen Shotzberger as an additional defendant,. (D.I.8.) Under Federal Rule of Civil Procedure 15(a), "[a] party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served." Fed.R.Civ.P. 15. Therefore, Colleen Shotzberger will be considered as a Defendant in deciding this motion.

Fox's claims are based on her alleged right to hold her prison job as Senior Inmate Office Clerk in the kitchen at Baylor, and on the retaliation she claimed she experienced when she filed verbal and written internal grievances. (D.I. 2 at 5-6.) However, " [t]raditionally, prisoners have had no entitlement to a specific job, or even to any job."*James v. Quinlan,* 866 F.2d 627, 630 (3d Cir.1989). Therefore, Fox has no right to hold her particular prison job.

Even if Fox did have a right to her prison job, to state a claim for retaliation, "plaintiff must allege that the 'retaliatory' action does not advance legitimate penological goals such as preserving institutional order and discipline."*Abdul-Akbar v. Department of Corrections,* 910 F.Supp. 986, 1001 (D.Del.1995). Fox has not alleged that the retaliation she perceived did not advance legitimate penological goals.

Furthermore, Fox cannot state a claim for violation of the Eighth Amendment based on the loss of her job. "In order to state a violation of the Eighth Amendment based on conditions of confinement,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 3

Not Reported in F.Supp.2d, 2005 WL 2365276 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

plaintiff must prove that defendants acted with deliberate indifference to deprive [her] of the ' minimal civilized measure of life's necessities.' A constitutional violation only occurs when the conditions of confinement 'have a mutually reinforcing effect that produces the deprivation of a single identifiable human need such as food, warmth or exercise,' and that '[n]othing so amorphous as overall conditions' can rise to the level of [such a violation] when no specific deprivation of a single human need exists.'" *Abdul-Akbar v. Department of Corrections,* 910 F.Supp. 986, 1005 (D.Del.1995) (internal citations omitted). Here, the loss of her prison job certainly does not rise to the level of deprivation of "the minimal civilized measure of life's necessities."

### III. CONCLUSION

For the foregoing reasons IT IS HEREBY ORDERED that:

1. Fox's Motion to Amend the Complaint (D.I.6) is GRANTED.

2. Fox's claims against Defendants are dismissed without prejudice as frivolous pursuant to 28 U.S.C. §§ 1915(e)(2)(B)-1915A(b)(1).

**\*3** 3. Fox's Motion for Preliminary Injunction (D.I.3) is DENIED as moot.

4. Fox's Motion for Appointment of Counsel (D.I.7) is DENIED as moot.

D.Del.,2005.
Fox v. Taylor
Not Reported in F.Supp.2d, 2005 WL 2365276 (D.Del.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.