IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| JAMES ST. LOUIS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civ. No. 06-236-SLR |
| | ) |
| LT. CHERYL MORRIS, et. al., | ) |
| | ) |
| Defendants. | ) |

James St. Louis, pro se

Catherine C. Damavandi, Deputy Attorney General, State of Delaware Department of Justice, Wilmington, Delaware.  Attorney for Defendant.

**MEMORANDUM OPINION**

Dated:  July 29, 2008
Wilmington, Delaware

**ROBINSON, District Judge**

## I. INTRODUCTION

Pro se plaintiff James St. Louis, ("plaintiff") filed this lawsuit pursuant to 42 U.S.C. § 1983 against defendants Lieutenant Cheryl Morris ("Morris"), Director Chris Klein ("Klein"), Administrator Michael Knight ("Knight"), Lieutenant Harry Legates ("Legates"), Lieutenant Eric Lehman ("Lehman"), Sergeant Andre Johnson ("Johnson"), and Sergeant Mary Boring ("Boring") (collectively "defendants") claiming he was fired, subsequently prevented from working and reclassified to medium-high security in retaliation for exercising his First Amendment rights to report institutional violations occurring in the kitchen. Defendants have filed a motion for summary judgment pursuant to Fed. R. Civ. P. 56. (D.I. 81) For the reasons given below, defendants' motion for summary judgment is granted.

## II. BACKGROUND

### A. Facts

Plaintiff, an inmate at James T. Vaughn Correctional Center ("JTVCC"), started working in the prison kitchen in approximately 2001. (D.I. 82 at A3) Sometime during late 2004 to early 2005, the head of sanitation, another inmate, sent plaintiff a letter proposing to give plaintiff a job in exchange for sexual favors. (Id. at A8) Plaintiff reported this incident to Knight who, plaintiff alleges, did nothing in response. (Id.)

At some later point, plaintiff was offered the position of First Cook by Legates but declined because he felt the job description was in violation of federal law.[1] (Id. at A12)

---

[1] Plaintiff contends it is a violation of federal law for inmates to be in supervisory positions over other inmates. This argument stems from a rather broad reading of McDuffie v. Estelle, 935 F.2d 682, 685-86 (5th Cir. 1991). McDuffie applied the doctrine of collateral estoppel to prevent prison officials from claiming qualified

Plaintiff later acquired the position of Second Cook and was supervised by fellow inmate, Arthur Govan ("Govan"), First Cook. (Id. at A10) Govan reported directly to Morris who was shift supervisor in charge of inmate hiring and payroll management. (Id. at A11) Legates was a lieutenant who managed the kitchen as a whole, along with Lehman. (Id. at A7) Klein was the deputy warden who gave final approval to any requests made by the kitchen inmate staff. (Id. at A11) Johnson and Boring were sergeants directly responsible for the inmates who worked in the kitchen. (Id. at A15)

Beginning in early 2005, plaintiff and Govan began to have disagreements over management of the kitchen. (Id. at A9) Plaintiff contends that Govan had been abusing his position as First Cook by giving the best jobs in the kitchen to those inmates who would pay him a bribe in the form of commissary items. (Id. at A10) Plaintiff reported these incidents to Morris to no avail. (Id. at A7) Plaintiff then reported these incidents to Legates who convened a meeting on March 8, 2005 with plaintiff and Morris concerning the complaints. (Id. at A7) Morris allegedly informed plaintiff that Govan was First Cook and that "whatever way he wants to run the kitchen is fine with her, as long as he didn't kill somebody." (Id. at A9)

Plaintiff and Morris held another meeting on March 19, 2005 after which Morris detailed procedures for inmate terminations, which would only occur in response to a violation of institutional rules. (D.I. 13 at 4) Plaintiff contends these procedures

---

immunity for Eighth Amendment violations that were previously established in other cases that involved a Texas Department of Correction program that placed inmates in security positions with similar authority to correctional officers over other inmates. The present case is distinguishable since it does not involve prison security but concerns the employment structure of the prison kitchen.

2

included a notice of infraction followed by a counseling session with termination only upon a second infraction. (Id.) Around the same time, Morris instituted a promotion system that allowed Govan to interview prospective candidates for the Third Cook position in the kitchen. (D.I. 82 at A10) Plaintiff alleges that Govan then began taking bribes in exchange for advanced notice of the interview questions and for recommendations to Morris. (Id.) As a Second Cook, plaintiff was to have taken part in the interview process, but refused due to his belief that a fellow inmate should not be in charge of inmate hiring. (Id.) Plaintiff alleges that "nine times out of ten [Morris] took the advice from Govan as to who he wanted to come into the kitchen." (Id.)

    Plaintiff's complaints about how Govan was running the kitchen continued throughout 2005 leading to, at one point, a meeting with the inmate kitchen staff where Morris stated that if anyone went over her head they would be fired and would never work in the prison again. (Id. at A12, A13) Approximately two weeks before Thanksgiving of 2005, the inmate kitchen staff was planning the Thanksgiving dinner. (Id. at A14) There was a tradition at JTVCC to allow the kitchen staff a special dinner in the weeks following the preparation of the Thanksgiving dinner as a reward for a the extra work. (Id.) Govan and another inmate apparently approached Klein about including bread pudding in the meal for the kitchen staff and Klein approved. (Id.) Plaintiff then told Boring about the plan to add bread pudding to the kitchen staff meal and contends that she replied that she likes raisins in bread pudding and asked if raisins could be added. (Id.) Plaintiff asserts that since raisins are contraband, he told Boring she would have to get it approved by the institution. (Id.) According to plaintiff, Boring agreed to e-mail Klein about adding raisins to the pudding. (Id.)

3

Immediately before Thanksgiving, the kitchen staff was short-handed and Govan came in on his day off. (Id. at A12) Govan allegedly told everyone present, including plaintiff, that if any of them did not come in to work on Thanksgiving day, they would be terminated. (Id.) Plaintiff and the other inmates took exception and one inmate brought a complaint to Johnson who discussed the incident with plaintiff. (Id.) Johnson then reprimanded Govan who immediately went to Morris and demanded that plaintiff be fired. (Id.) Morris then informed plaintiff that Govan was going to run the kitchen the way he wanted and that plaintiff could leave if he did not like it. (Id. at A13) Both plaintiff and Govan were given a week of probation. (Id.)

On December 7, 2005, the inmate kitchen staff started to plan their special staff meal. (Id. at A14) While planning for the meal, plaintiff reconfirmed the approval for the bread pudding with Johnson; plaintiff, however, did not mention raisins. (Id.) Plaintiff then contends he informed Boring that she could email Klein about the raisins since the staff meal had been approved. (Id.) Unknown to plaintiff, Boring compiled an Incident Report, asserting she was asked by plaintiff to bring in raisins and that he lied to her that Klein had approved it. (D.I. 82 at B1) This report, approved by Morris on December 8, accuses plaintiff of abuse of privileges and lying to a correctional officer.[2] (Id.) December 8 was plaintiff's day off, but he was called in to Lehman's office to meet with Lehman and Morris concerning a "fact-finding" over the raisin controversy. (D.I. 13 at 6) Morris questioned plaintiff about his interaction with Boring and did not indicate a

---

[2]There is no indication of whether the Incident Report was written before or after the "fact-finding" meeting between plaintiff, Morris, and Lehman, as discussed in more detail below.

disciplinary report would issue. (Id.)

The next day, December 9, plaintiff returned to work in the kitchen. (Id. at A15) He was approached by another cook and asked why he was in the kitchen since he had been terminated. (Id.) Plaintiff questioned the cook and was told that First Cook Govan had terminated him. (Id.) Plaintiff then went to see Lehman to ask if he had been terminated as a result of the meeting the previous day and was told that Govan could not terminate the employment of any inmate in the kitchen and to go back to work. (Id.) A short time later, Lehman approached plaintiff and informed him that Morris did, in fact, terminate him and after a short amount of time produced the Incident Report written by Boring at plaintiff's request. (Id.)

On December 10, plaintiff filed a grievance detailing the incident and requesting an apology from Boring and reinstatement to his job in the kitchen. (Id. at D1-D5) On January 10, 2006, the grievance was returned unprocessed as "Non-Grievable" since the incident was part of a disciplinary action. (Id. at D2) A disciplinary report was submitted on February 15 and a disciplinary hearing was held by hearing officer Heverin on February 23 where plaintiff was found guilty of the charges detailed in the Incident Report. (Id. at C1-C2) Plaintiff appealed the hearing decision which was denied on March 2. (Id. at C3-C4) Heverin ordered a sanction of five days confinement to quarters. (Id. at C2) Plaintiff's confinement ran from April 10 until April 14. (Id.) At some point, plaintiff wrote Deputy Warden Peirce about the incident; Peirce responded by assigning a Lieutenant Bradley to investigate. (Id. at A16) Plaintiff alleges that Bradley investigated the incident and informed him that Boring did not want to file the incident report but was ordered to by Morris and that Bradley indicated plaintiff may

5

have a retaliation claim. (Id.)

### B. Procedural History

On April 10, 2006, plaintiff filed a complaint against Morris, Klein and "all other officers" of DOC in United States District Court for the District of Delaware alleging violations of the Eighth and Fourteenth Amendments to the United States Constitution. (D.I. 2) This complaint was dismissed on June 16, 2006 as frivolous under 42 U.S.C. § 1915 and 42 U.S.C. § 1997e. (D.I. 6) In July of 2006, plaintiff was transferred to the Medium-High Housing Unit ("MHU"), allegedly as a result of the kitchen incident. (D.I. 82 at A17) Plaintiff filed a motion to reconsider which the court granted in part on September 26, 2006 finding a cognizable retaliation claim and allowed plaintiff to file an amended complaint on this claim only; the dismissals of all other claims were left undisturbed. (D.I. 11) On October 13, 2006, plaintiff filed the amended complaint dropping "all officers" and adding the remainder of defendants to the action and alleging that Morris ordered Boring to write the incident report so he would be fired from the kitchen in retaliation for his complaints of Govan's activities. (D.I. 13) He also contends in his deposition that Morris has successfully prevented him from working elsewhere and that he fears further retaliation because Morris has a relationship with a captain with influence at JTVCC. (D.I. 82 at A4, A22) In November of 2006, plaintiff was reclassified and moved out of MHU.[3] (Id. at A4) Plaintiff alleges that he suffered from

---

[3]Plaintiff sent the court a letter on March 24, 2008 asserting that he was reclassified to minimum security after fifteen months at medium, was given an apology for the errant classification, and told that the kitchen incident was removed from his record. He also alleges that he has been told that he cannot work until the instant suit is disposed of. Plaintiff does not provide any proof of these statements in his letter.

various physical manifestation of stress from the time he was fired until approximately November of 2006 when he was moved out of MHU. (Id. at A21) Following discovery, defendants filed their motion for summary judgment on October 12, 2007. (D.I. 81)

## III. STANDARD OF REVIEW

A court shall grant summary judgment only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of proving that no genuine issue of material fact exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 n.10 (1986). "Facts that could alter the outcome are 'material,' and disputes are 'genuine' if evidence exists from which a rational person could conclude that the position of the person with the burden of proof on the disputed issue is correct." Horowitz v. Fed. Kemper Life Assurance Co., 57 F.3d 300, 302 n.1 (3d Cir. 1995) (internal citations omitted). If the moving party has demonstrated an absence of material fact, the nonmoving party then "must come forward with 'specific facts showing that there is a genuine issue for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The court will "view the underlying facts and all reasonable inferences therefrom in the light most favorable to the party opposing the motion." Pa. Coal Ass'n v. Babbitt, 63 F.3d 231, 236 (3d Cir. 1995). The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). If the nonmoving party fails

to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

**IV. DISCUSSION**

A pro se complaint is liberally construed and held to a standard less stringent than formal pleadings. Erickson v. Pardus, --- U.S. ----, 127 S.Ct. 2197, 2200 (2007). When an adverse party fails to respond to a summary judgment motion, Rule 56(e) requires the court to grant the motion only "if appropriate." Anchorage Assocs. v. V.I. Bd. of Tax Review, 922 F.2d 168, 175 (3d Cir. 1990) (quoting Fed. R. Civ. P. 56(e)). The United States Court of Appeals for the Third Circuit has treated a pro se complaint containing the statement "I declare under penalty of perjury that the foregoing is true and correct" as an affidavit for the purpose of opposing a summary judgment motion. Reese v. Sparks, 760 F.2d 64, 67 n.3 (3d Cir. 1985). The burden remains on the nonmoving party, not the court, to identify sufficient facts from the record that show the existence of a genuine issue for trial. Childers v. Joseph, 842 F.2d 689 (3d Cir. 1988). Summary judgment will be granted if the facts set forth by the moving party support a judgment as a matter of law. Anchorage Assocs., 922 F.2d at 175.

Defendants make four arguments for summary judgment in their favor. (D.I. 82) First, they contend that they are entitled to judgment on the retaliation claim. Second, they claim that all defendants are entitled to qualified immunity from suit. Third, they argue that those defendants that were not personally involved in the alleged constitutional violation are entitled to summary judgment. Fourth, they assert that the Eleventh Amendment to the United States Constitution precludes that portion of the

claim made against state officials in their official capacity. The court finds that plaintiff does not satisfy his burden to sustain his § 1983 retaliation claim, therefore, the court will not discuss defendants' arguments concerning personal involvement and Eleventh Amendment immunity.

Defendants argue they are entitled to qualified immunity. (D.I. 82 at 9) Qualified immunity is a privilege extended to public officials "insulating them from suit . . . to protect them 'from undue interference with their duties and from potentially disabling threats of liability.'" Wright v. City of Philadelphia, 409 F.3d 595, 599 (3d Cir. 2005) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 806 (1982)). This privilege is overcome if the violated right was a "clearly established . . . constitutional right[] of which a reasonable person would have known." Id. The initial question is whether the facts show a violation of a constitutional right. See Scott v. Harris, --- U.S. ----, 127 S.Ct. 1769, 1774 (2007). Only then may the court proceed to determine if the right violated was clearly established. Id. This Supreme Court precedent expresses a preference to explore the merits of an alleged constitutional violation in plaintiff's § 1983 claim, to which the court now turns. See County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998).

Defendants also contend that they are entitled to judgment on the retaliation claim. (D.I. 82 at 6) To prove a retaliation claim, plaintiff must first "prove that the conduct which led to the alleged retaliation was constitutionally protected." Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001). Second, plaintiff must "show that he suffered some 'adverse action' at the hands of the prison officials." Id. After these initial burdens are met, plaintiff must then establish a causal link between the protected

conduct and the adverse action taken against him by showing that "his constitutionally protected conduct was 'a substantial or motivating factor' in the decision to discipline him." Id. (quoting Mount Healthy Bd. of Ed. v. Doyle, 429 U.S. 274, 287 (1977)). Once such a showing is made by plaintiff, defendants "may still prevail by proving that they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Id. at 334 (citing Turner v. Safely, 482 U.S. 78, 89 (1987)).

Whether plaintiff's conduct was a protected activity is a question of law for the court to decide. See Curinga v. City of Clairton, 357 F.3d 305, 310 (3d Cir. 2004). Liberally construed, plaintiff asks the court to find that his reporting of violations in the kitchen was protected petitioning under the First Amendment, and that he experienced retaliation for reporting those violations to prison administrators.[4] (D.I. 13) Plaintiff does not meet this initial threshold in his claim, however, because the only grievances and appeals indicated in the record occurred after his termination, and so could not

---

[4]Defendants argue that since plaintiff has no right to employment while in prison, he could not have experienced an adverse action. It is well established that a prisoner does not have a constitutional right to employment while an inmate. See James v. Quinlan, 866 F.2d 627, 630 (3d Cir. 1989). A First Amendment retaliation claim can survive, however, even if plaintiff does not have a vested interest in the benefits withheld as long as plaintiff's conduct is constitutionally protected. See Allah v. Seiverling, 229 F.3d 220, 224-25 (3d Cir. 2000). This reflects the long standing distinction between "the entitlement to a benefit that gives rise to a property interest protected under the [F]ourteenth [A]mendment due process clause and a benefit that is protected under the [F]irst [A]mendment." Robb v. City of Philadelphia, 733 F.2d 286, 295 (3d Cir. 1984). A state official cannot deprive someone of a benefit on a basis that infringes First Amendment rights, regardless of whether the individual has a right to the benefit or not. Id.; see also Rust v. Sullivan, 500 U.S. 173, 197 (1991) (stating that the state cannot "place a condition on the recipient of [a benefit that] effectively prohibit[s] the recipient from engaging in the protected conduct.").

have been the activity that substantially motivated the adverse action against him. The only evidence provided by plaintiff is his deposition testimony that he reported his complaints to Morris regularly. (D.I. 82 at 13) Defendants argue, citing no authority, that such complaints do not rise to the level of "constitutionally protected activity." (D.I. 82 at 7) The court agrees only to the extent that plaintiff has not provided any evidence of formal complaints or grievances filed prior to the adverse action. Filing grievances and formal complaints against corrections officials is a constitutionally protected activity under the First Amendment and falsifying misconduct reports against a prisoner who engages in that activity is a constitutional tort. See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir. 2003) (filing complaints); Robinson v. Taylor, 204 Fed. Appx. 155, 157 (3d Cir. 2006) (non-precedential) (filing grievances); Smith v. Mensinger, 293 F.3d 641, 653 (3d Cir. 2002) (filing a lawsuit). In other words, the conduct described by plaintiff and attributed to defendants is objectionable, but not actionable on the record presented.

Plaintiff's unsubstantiated deposition testimony concerning informal, verbal complaints do not satisfy the evidentiary burden established by this case law. Nor is there any evidence beyond hearsay that Morris ordered Boring to file a falsified Incident Report on the raisin incident. Hearsay statements can be "considered on a summary judgment motion if they are capable of admission at trial." Shelton v. Univ. of Med. & Dentisty of N.J., 223 F.3d 220, 223 n.2 (3d Cir. 2000). It is doubtful that any statements plaintiff attributes to non-parties that would tend to prove his assertion would be capable of being verified at trial, placing their admissibility in question. Without any substantiated proof of constitutionally protected conduct or of the alleged constitutional tort, plaintiff fails to identify a genuine issue of material fact. As a result, the remainder

of the elements in plaintiff's retaliation claim and defendants' assertion of qualified immunity need not be addressed.

## V. CONCLUSION

For the aforementioned reasons, defendants' motion for summary judgment is granted.